STATE of Wisconsin EX REL. ANGELA M.W., Petitioner,†

v.

William KRUZICKI, Sheriff of Waukesha County, Rexford W. Titus, III, President, Waukesha Memorial Hospital, Fred Syrjanen, Director, Lawrence Center, & Director of Chemical Dependency at Waukesha Memorial Hospital, Circuit Court for Waukesha County, the Honorable Kathryn W. Foster, Waukesha County Corporation Counsel Thomas Farley, and Assistant Corporation Counsel William Domina, Respondents.

Court of Appeals

No. 95–2480–W. *Oral argument September 20, 1995.—Decided October 6, 1995.*

(Also reported in 541 N.W.2d 482.)

†Petition to review granted.

536

On behalf of the petitioner, there were briefs by *Robin Shellow* and *Angela Conrad* of the *Law Offices of Robin Shellow* volunteer attorneys for the American Civil Liberties Union of Wisconsin Foundation, and *Peter Koneasny* legal director of the American Civil Liberties Union of Wisconsin Foundation. There was oral argument by *Angela Conrad.*

On behalf of the respondents, there were briefs by *William J. Domina*, assistant corporation counsel, and *Margaret M. Zimmer*, assistant corporation counsel. There was oral argument by *William Domina.*

There was a brief and oral argument by Guardian ad Litem, *Jill C. Vento*, of *Brenner, Brenner & Wall*, of Waukesha.

Before Anderson, P.J., Brown and Nettesheim, JJ.

NETTESHEIM, J. Angela M.W., the mother of a viable fetus, filed an original action in this court seeking a writ of habeas corpus or, in the alternative, a supervisory writ barring the Waukesha County juve-

nile court from continuing to exercise jurisdiction in a pending child in need of protection or services (CHIPS) proceeding pursuant to § 48.13, STATS.

The threshold issue is whether Angela's viable fetus is a "child" within the meaning of the juvenile code, § 48.02(2), STATS. We conclude that a viable fetus is a child within the meaning of the statute. As such, we further conclude that the State has a legitimate and compelling interest under *Roe v. Wade*, 410 U.S. 113 (1973), to provide CHIPS protection to the fetus. We therefore hold that the juvenile court has jurisdiction to adjudicate the pending CHIPS proceeding.

A further issue is whether an order for the protective custody of a viable fetus pursuant to § 48.19(1)(c), STATS., in a CHIPS proceeding is violative of the mother's constitutional due process and equal protection rights since such an order, by necessity, also requires the custody of the mother. We hold that such an order is constitutional. We therefore reject Angela's applications for a writ of habeas corpus or a supervisory writ.[1]

### FACTS

The facts and history of this case are undisputed. Angela is the adult mother of a viable fetus. Angela has chosen to carry her fetus to full term, and her projected delivery date was October 4, 1995.[2] During her preg-

---

[1] On September 25, 1995, we issued an order denying Angela's requested relief from this court. In that order, we indicated that this written decision would follow. We employed this procedure so that Angela would immediately know her status under the juvenile court's custodial order and because the birth of her child was imminent.

[2] Our order deciding this case was issued while Angela was still pregnant. This decision is released after Angela's projected

nancy, Angela was treated by her obstetrician. Based upon his observations during this treatment, the obstetrician suspected that Angela was using cocaine or other drugs during her pregnancy. As a result, the obstetrician performed drug-screening tests on Angela. These tests confirmed the presence of cocaine or other drugs in Angela's blood on May 31, June 26, July 21 and August 15, 1995. The obstetrician counseled Angela to seek voluntary inpatient treatment. Angela declined.

After Angela failed to keep scheduled appointments with her obstetrician on August 28 and September 1, 1995, the obstetrician reported his concerns to the appropriate authorities pursuant to the mandatory reporting requirements of § 48.981(2), STATS.[3] Based on this report, the Waukesha County Department of Health and Human Services (the County) sought an order from the juvenile court, the Honorable Kathryn W. Foster, directing that Angela's viable fetus be taken into protective custody pursuant to § 48.19(1)(c), STATS. This statute authorizes the juvenile court to order that a child be taken into protective custody upon a satisfactory showing "that the welfare of the child demands that the child be immediately removed from his or her present custody." *Id.*

On September 5, 1995, the juvenile court granted the County's request and issued the protective custody order. The order reads, in relevant part:

---

delivery date and we are informed that Angela has now given birth to a baby boy.

[3] Section 48.981(2), STATS., generally requires a physician and certain other persons to report instances of suspected child abuse or neglect when such suspicion is based on reasonable cause.

Pursuant to a showing under Section 48.19(1)(c), Wis. Stats., which is satisfactory to this Court, the Circuit Court hereby directs that [the viable fetus], be detained under Section 48.207(1)(g), Wis. Stats., by the Waukesha County Sheriff's Department and transported to Waukesha Memorial Hospital for inpatient treatment and protection.[4] Such detention will by necessity result in the detention of the unborn child's mother, [Angela].

The next day, September 6, 1995, the County filed a CHIPS petition with the juvenile court. The petition alleged that the viable fetus was in need of protection or services because its "parent . . . neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child, pursuant to Section 48.13(10) of the Wisconsin Statutes." The petition incorporated an attached affidavit of Angela's treating obstetrician which recited his observations, opinions and concerns. The affidavit included the obstetrician's following statements:

10. As a licensed obstetrician, it is my opinion that [Angela's] active cocaine usage presents a real and immediate danger to the health[,] safety and continued viability of her unborn child.

11. It is my opinion that without intervention forcing [Angela] to cease her drug use that she will continue using cocaine and other drugs with the following likely effects on her unborn child: low weight gain, abruptio placentae, increased infectious diseases, hypertension and tachycardia,

---

[4] Section 48.207(1)(g), STATS., authorizes nonsecure protective custody in a hospital.

preterm labor and delivery, possible precipitous delivery, and increased risks for pregnancy loss, including spontaneous abortion and still birth, SIDS, congenital malformations, intraventricular hemorrhage and precipitous labor.

Before the protective custody order was executed, Angela presented herself for voluntary inpatient drug treatment at a treatment facility. As a result, the juvenile court amended the order to provide that the viable fetus was to be held in protective custody at the treatment facility selected by Angela.[5] However, the amended order further provided that if Angela left the treatment facility, the fetus was to be held in protective custody at Waukesha Memorial Hospital.

Thereafter, on September 7 and 8, 1995, the juvenile court conducted a detention hearing pursuant to § 48.21(1), STATS.[6] At the first hearing, Angela appeared telephonically, but without counsel. At the second hearing, Angela again appeared telephonically, but with counsel. At this hearing, Angela's counsel objected to the jurisdiction of the juvenile court. The court rejected Angela's jurisdictional challenge, but indicated that it would continue to review the matter. The court also scheduled a plea hearing for September 13.

---

[5] This amended order was entered by Judicial Court Commissioner Linda Georgeson.

[6] Section 48.21(1)(a), STATS., provides, in relevant part:

If a child who has been taken into custody is not released under s. 48.20, a hearing to determine whether the child shall continue to be held in custody under the criteria of ss. 48.205 to 48.209 shall be conducted by the judge or juvenile court commissioner within 24 hours of the time the decision to hold the child was made, excluding Saturdays, Sundays and legal holidays.

Angela responded with this original action in the court of appeals, asking that we issue a writ of habeas corpus releasing her from the constraints of the protective custody order or, in the alternative, that we issue a supervisory writ barring the juvenile court from exercising jurisdiction in the pending CHIPS action.[7] The County and the fetus' guardian ad litem have responded to Angela's petition, and all of the parties have provided us with legal memoranda in support of their respective positions. In addition, this court heard oral arguments from the parties on September 20, 1995.

## INTRODUCTION

We begin with some preliminary observations. This case presents important issues of first impression in Wisconsin. In addition to our consideration of the parties' briefs and the oral argument, this court has engaged in lengthy and intense internal discussions regarding the matter. The limited authority from other jurisdictions and from the various commentators reveals a divergence of opinion on the issues before us. That same difference of opinion exists within this court, as borne out by our colleague's dissenting opinion. Our differing opinions each find support in these conflicting authorities. Although we ultimately disagree with the position of our dissenting colleague, his contributions to our deliberations have been positive and thought provoking, as is his separate opinion.

---

[7] Angela also asked that we temporarily stay the plea hearing scheduled for September 13, 1995. We denied this request. At the initial hearing, the juvenile court entered a denial on Angela's behalf and scheduled the matter for a jury trial on October 4, 1995.

Although the authority cited to us from other states and sources is informative, we do not find it necessary to dwell at length on those statements. Nor do we find it necessary to squarely address many of the positions asserted by the dissent which looks to certain of this authority for support. This is because our decision is based on the public policy which we discern from existing Wisconsin cases, from the Wisconsin juvenile code and from decisions of the United States Supreme Court.

Finally, we observe that our positions as judges do not insulate us from the highly personal and sometimes emotionally charged nature of the issues present in these kinds of cases. *See L.K. v. B.B.*, 113 Wis. 2d 429, 464, 335 N.W.2d 846, 863 (1983) (Abrahamson, J., dissenting). Nonetheless, our obligation is to decide this case on the basis of the applicable facts and law, free of the heightened rhetoric which often accompanies the public debate about these kinds of issues. Most importantly, we are ethically bound to follow the law, and we may not allow our personal concepts of justice to override that law. *See* SCR 60.01(1) (West 1995). This court, both majority and dissent, has striven to keep the discussion on this level.

## STANDARDS AND BURDEN OF PROOF

Angela raises three issues. She claims: (1) the juvenile court does not have jurisdiction over her viable fetus, (2) the juvenile court does not have jurisdiction over Angela herself, and (3) the juvenile court's issuance of a protective custody order violates her constitutional rights to due process of law and equal protection under the United States Constitution and the Wisconsin Constitution.

■

Angela seeks habeas corpus relief or, in the alternative, supervisory relief from this court. However, regardless of the relief she seeks, the gravamen of Angela's argument is that she is illegally detained by the juvenile court's protective custody order. The purpose of the writ of habeas corpus is to protect and vindicate the petitioner's right of personal liberty by releasing the petitioner from illegal restraint. *State ex rel. Zdanczewicz v. Snyder*, 131 Wis. 2d 147, 151, 388 N.W.2d 612, 614 (1986). Angela's argument presents a classic habeas corpus test. She makes no further or different argument in support of her alternative claim for supervisory writ relief. Thus, we will answer Angela's challenge in the context of her habeas corpus claim, and we will not separately discuss her alternative claim for a supervisory writ.

■

In a habeas corpus proceeding, the burden is on the petitioner, here Angela, to demonstrate by a preponderance of the evidence that the detention is illegal. *See State ex rel. Alvarez v. Lotter*, 91 Wis. 2d 329, 334, 283 N.W.2d 408, 410 (Ct. App. 1979).

We do not read Angela's arguments (at least at this early stage of the pending CHIPS proceedings) to challenge the factual underpinning for the commencement of the CHIPS matter pursuant to § 48.13(10), STATS., or for the issuance of the concurrent protective custody order pursuant to § 48.19(1)(c), STATS. The former statute vests the juvenile court with exclusive original jurisdiction over a child whose parent neglects, refuses or is unable for reasons other than poverty to provide necessary care, including medical care, where such conduct seriously endangers the physical health of the child. The latter statute authorizes the juvenile court

to issue an order for the custody of the child upon a satisfactory showing that the welfare of the child demands such action. The affidavit of Angela's obstetrician recites facts clearly sufficient to satisfy both statutes.

Rather, Angela's challenge is legally premised. She contends that the juvenile court does not have CHIPS jurisdiction over her or her viable fetus. And, even if such jurisdiction exists, Angela contends that the juvenile court's issuance of a protective custody order under § 48.19(1)(c), STATS., violates her constitutional rights. We discuss these issues seriatim.

## *JURISDICTION*

In order to exercise its power over a case, a court must have both subject matter jurisdiction and personal jurisdiction. *P.C. v. C.C.*, 161 Wis. 2d 277, 297, 468 N.W.2d 190, 198, *cert. denied*, 502 U.S. 925 (1991). Section 48.13, STATS., vests the juvenile court with "exclusive original jurisdiction over a child alleged to be in need of protection or services." The statute then goes on to set out fourteen specific scenarios in which the juvenile court is empowered to act. In this case, the County relies on subsec. (10), governing those situations in which the child's parent fails to provide requisite care so as to seriously endanger the physical health of the child.

In making her jurisdictional arguments, Angela does not specify whether she is challenging the juvenile court's subject matter or personal jurisdiction. We suspect her challenge is to the juvenile court's subject matter jurisdiction. However, in the interest of completeness, we will discuss both.

## 1. *Subject Matter Jurisdiction*

Subject matter jurisdiction requires that the statutes or the constitution confer authority on the court to adjudicate the matter before it. *P.C.*, 161 Wis. 2d at 297-98, 468 N.W.2d at 198. Angela argues that the juvenile court exceeded its jurisdiction in this case because a viable fetus is not a child within the meaning of § 48.02(2), STATS. If that is true, then the juvenile court had no authority to adjudicate this matter, and the court's assumption of jurisdiction was in excess of that conferred by the statute.

Angela's argument requires that we interpret § 48.02(2), STATS., which defines a "child" for purposes of the juvenile code as "a *person* who is less than 18 years of age." (Emphasis added.) The interpretation of a statute presents a question of law which we review de novo. *Brandt v. LIRC*, 160 Wis. 2d 353, 361, 466 N.W.2d 673, 676 (Ct. App. 1991), *aff'd*, 166 Wis. 2d 623, 480 N.W.2d 494 (1992). In construing a statute, we begin with the language of the statute itself, and if the language is clear on its face, we are precluded from referring to extrinsic sources to aid our interpretation. *Id.* at 362, 466 N.W.2d at 676.

Angela argues that the statute is clear and unambiguous. In support, she reasons that a viable fetus is not a "child" because: (1) a fetus has no age; (2) a CHIPS petition must allege, inter alia, the birth date of the child, § 48.255(1)(a), STATS.; and (3) when the legislature has seen the need to include a fetus in a

statutory classification, including the juvenile code, it has expressly done so.[8]

We have no substantial quarrel with Angela's reasoning as far as it goes.[9] However, it does not go far enough. For even if a statute appears unambiguous on its face, it can be rendered ambiguous as applied. *See Brandt*, 160 Wis. 2d at 368, 466 N.W.2d at 679. "[E]ven apparently plain words, divorced from the context in which they arise and in which their creators intended them to function, may not accurately convey the meaning the creators intended to impart. It is only, therefore, within a context that a word, any word, can communicate an idea." *Leach v. Federal Deposit Ins. Corp.*, 860 F.2d 1266, 1270 (5th Cir. 1988), *cert. denied*, 491 U.S. 905 (1989).

We properly bear in mind that the legislature cannot be reasonably expected to address every scenario under which its law might be applied. "[T]he very nature of today's society makes it impossible for the

---

[8] *See, e.g.,* § 20.927(4), STATS., pertaining to the prohibited subsidy of abortions; § 46.03(34), STATS., addressing the powers and duties of the Department of Health and Social Services; §§ 48.257(1)(b) and 48.375(2)(a), STATS., covering parental consent to a minor's abortion; § 69.01(13m), STATS., defining "induced abortion"; § 146.817, STATS., defining "fetal monitor tracing"; § 253.09, STATS., addressing a hospital's refusal to honor a patient's request for an abortion; § 253.10(1)(a)2 and (1)(c), STATS., dealing with informed consent for abortions; and §§ 441.06(6) and 448.03(5), STATS., granting civil immunity to certain licensed medical personnel who refuse to perform an abortion or sterilization procedure on religious or moral grounds.

[9] However, we see no reason why a CHIPS petition could not satisfy the birth date requirement by alleging that the child does not yet have a birth date because it has not yet been born.

members of the legislature to forecast the particular condition or set of facts to which someone now suggests applying the statute." *State v. Knutson, Inc.*, 196 Wis. 2d 86, 97, 537 N.W.2d 420, 423 (Ct. App. 1995) (quoted source omitted). When our supreme court spoke to the topic of fetal injury in *Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 357, 99 N.W.2d 163, 171 (1959), *overruled on other grounds by Stromsted v. St. Michael Hosp.*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980), it stated, "If the common law has any vitality, . . . it should be elastic enough to adapt itself to current medical and scientific truths so as to function as an efficient rule of conduct in our modern, complex society."

The test for ambiguity of a statute is whether reasonable minds could differ as to its meaning. *See E.H. v. Milwaukee County*, 151 Wis. 2d 725, 731, 445 N.W.2d 729, 731 (Ct. App. 1989). We conclude that reasonable minds could differ as to whether the statutory definition of a child applies to a viable fetus in a CHIPS proceeding. The sharp conflict in authority among the various jurisdictions and commentators alone bears this out. However, we base our conclusion on three more compelling considerations: (1) our supreme court has already construed a viable fetus as a "person" within the meaning of Wisconsin's wrongful-death statute, *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 19, 148 N.W.2d 107, 110 (1967); (2) the public policy considerations expressed in *Kwaterski* and those earlier expressed in *Puhl*; and (3) the admonition in *Puhl* that the common law should be flexible enough to adopt itself to current medical and scientific truths, *Puhl*, 8 Wis. 2d at 357, 99 N.W.2d at 171.

■ On the merits, we conclude that a viable fetus is a "person" within the statutory definition of a child as set out in § 48.02(2), STATS. We base this conclusion on the public policy expressed from three sources: (1) the United States Supreme Court, (2) the Wisconsin legislature, and (3) the Wisconsin Supreme Court.

We begin our discussion with *Roe v. Wade*. *Roe* is the landmark case recognizing a woman's constitutional right, within certain constraints, to choose an abortion.[10] *Roe*, 410 U.S. at 163. We stress that this case is not about Angela's constitutional right to choice under *Roe*. That right has been honored to the fullest in this case. Instead, this case is about consequences: first, the consequences of Angela's choice under *Roe*; and second, the consequences of Angela's conduct which has placed her viable fetus at risk of serious physical harm or death.

Often lost in the clamorous and polarized public debate about *Roe* is another important holding of the case—the recognition of the state's legitimate interest in protecting potential life when that interest becomes "sufficiently compelling." *See id.* at 154. Thus, under *Roe*, a woman's right to an abortion is not absolute, *see id.*, and the state may act to promote its interest in the potentiality of human life represented by a viable fetus, *id.* at 163-64.

---

[10] *Roe v. Wade*, 410 U.S. 113 (1973), constructed a trimester framework within which the competing interests of a woman's right to choose an abortion and the state's interest in promoting the potential life of a fetus were balanced. Later, in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), the Supreme Court altered *Roe*'s trimester framework and instead drew the line for permissible state regulation at viability. *Casey*, 505 U.S. at 872-73, 879.

This brings us to Wisconsin's CHIPS law. *Roe* was decided in 1973. Wisconsin's CHIPS statute was created by Laws of 1977, ch. 354, § 24. This legislation replaced the former § 48.13, STATS., which applied to "children alleged to be neglected or dependent." *See, e.g.,* § 48.13, STATS., 1973. Included in the new legislation was subsec. (10), the provision relied on by the County in this case. We presume that when the legislature acts, it is aware of the law, including a supreme court's interpretation of the law. *See State v. Iglesias*, 185 Wis. 2d 117, 140, 517 N.W.2d 175, 183, *cert. denied*, 513 U.S. —, 115 S. Ct. 641 (1994). With *Roe* on the books, the constitutional way had been cleared for the Wisconsin legislature to enact legislation, should it so choose, to promote and protect the potential life represented by a viable fetus.

It is self-evident from a reading of the CHIPS statute that its purpose is to protect children at risk. In light of *Roe*, which forbids the abortion of a viable fetus and which empowers the states to protect the potential life of such a fetus, it would be incongruous for us to conclude that the CHIPS statute does not empower the state to take the very steps which *Roe* expressly envisioned.

For this reason, we reject the reasoning of the dissent and those commentators who interpret *Roe* and its progeny to allow only state regulation of abortion. The clear purpose of the CHIPS statute is to protect children from the risk of physical harm. That goal can hardly be achieved if the potential life of a viable fetus, a legitimate compelling state interest under *Roe*, is not provided a safe environment in the womb of its mother

and is beyond the reach of the state in a CHIPS proceeding.[11]

---

[11] The position of the commentators representing this narrow view of *Roe* is represented by the following: "[*Roe*] placed an essential limit on the exercise of [the state's] interest by expressly permitting a woman to obtain an abortion even after fetal viability if 'it is necessary to preserve (her) life or health.' Thus, it is incorrect to assert that *Roe* grants the state unrestricted authority to protect the viable fetus or to prohibit abortions after viability." Lawrence J. Nelson & Nancy Milliken, *Compelled Treatment of Pregnant Women; Life, Liberty, and Law in Conflict*, 259 JAMA 1060, 1062 (1988).

The obvious result of this interpretation of *Roe* is that the mother is free to do what she wants irrespective of the health or safety of the fetus. This position is refuted by the words of Justice Harry A. Blackmun in *Roe* itself: "[I]t is not clear to us that the claim asserted by some amici that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decisions. The Court has refused to recognize an unlimited right of this kind in the past." *Roe*, 410 U.S. at 154. In his separate opinion in *Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989), Justice Blackmun again spoke to this matter: "[T]he *Roe* framework, and the viability standard in particular, fairly, sensibly, and effectively functions to safeguard the constitutional liberties of pregnant women while recognizing and accommodating the State's interest in potential human life. . . . [T]he viability standard takes account of the undeniable fact that as the fetus evolves into its postnatal form, and as it loses its dependence on the uterine environment, the State's interest in the fetus' potential human life, and in fostering a regard for human life in general, becomes compelling." *Webster*, 492 U.S. at 553 (Blackmun, J., concurring in part and dissenting in part).

We are thus satisfied that the state's interest in the health and welfare of the fetus after it attains viability is recognized under *Roe* and that state intervention on behalf of such a fetus is allowed under *Roe* where such interest is shown to be compel-

Moreover, our supreme court has already spoken to this matter, albeit in a different context. In *State v. Black*, 188 Wis. 2d 639, 641, 526 N.W.2d 132, 133 (1994), the defendant had killed his unborn quick child as the result of an assault upon the mother. He was charged with feticide pursuant to § 940.04(2)(a), STATS., which makes it illegal for any person, other than the mother, to intentionally destroy the life of an unborn child. *Black*, 188 Wis. 2d at 643, 526 N.W.2d at 134.

On appeal, the defendant argued that the feticide statute could not be enforced against him because it was intended "to apply only in the context of consensual medical abortions." *Id.* at 644, 526 N.W.2d at 134. The defendant also argued that the feticide statute "was impliedly repealed when the legislature enacted [the abortion statute] § 940.15 in response to *Roe v. Wade*." *Black*, 188 Wis. 2d at 644-45, 526 N.W.2d at 134. The supreme court rejected this argument, holding that the feticide statute was "not an abortion statute." *Id.* at 646, 526 N.W.2d at 135. Thus, *Black* recognizes that the state may enact and enforce laws

ling. As we have indicated, our legislature has exercised its privileges under *Roe* through the CHIPS statute.

The commentators who espouse this narrow reading of *Roe* fail to recognize the incongruity of their position—a matter which we have already noted in the body of this opinion. By recognizing that a state may intervene in an abortion decision after viability, *Roe* necessarily recognizes the right of the state to protect the potential life of the fetus over the wishes of the mother to terminate the pregnancy. Why then cannot the state also protect the viable fetus from maternal conduct which functionally presents the same risk and portends the same result—the death of the viable fetus? Absent a logical answer to this question, the logic of the commentators' premise is also suspect.

outside the abortion context which protect a viable fetus. CHIPS is such a law.

We now turn to the Wisconsin case law and the public policy expressed therein which have addressed the status of a fetus as it bears upon standing to assert a claim for fetal injury. In *Puhl*, the plaintiff was born alive as a "Mongoloid" child, a condition which she alleged was caused by an automobile accident which occurred when she was a nonviable fetus. *Puhl*, 8 Wis. 2d at 351, 99 N.W.2d at 168. Although the jury returned a favorable verdict, the trial court struck the award based on the prevailing law expressed in *Lipps v. Milwaukee Elec. Ry. & Light*, 164 Wis. 272, 159 N.W. 916 (1916). That law held that "a child during pregnancy was a part of its mother and, not being a person *in esse* at the time of injury, had no rights, and no cause of action could accrue for any prenatal injury." *Puhl*, 8 Wis. 2d at 354, 99 N.W.2d at 169.

Upon review, the supreme court upheld the trial court's ruling on a different ground, holding that the evidence did not sufficiently establish causation. *Id*. However, the court went on to discuss the then-developing law regarding the right of a person born alive to recover for prenatal injuries. While this discussion did not resolve the issue with finality, the *Puhl* decision raised serious questions about the continuing vitality of *Lipps*.

The *Puhl* court discussed the two developing theories on the question: (1) the "viability theory," which drew the line between an enforceable and nonenforceable claim at the point of viability; and (2) the "biological theory," which made no distinction between viability and nonviability, but instead triggered liability if the fetus was born alive regardless of when the

fetal injury occurred. *Puhl*, 8 Wis. 2d at 356, 99 N.W.2d at 170.

In the course of this discussion, the *Puhl* court made three observations which we deem important to the issue before us. First, the court noted that "medical knowledge" and "common knowledge" established "that a child in the viable stage can and does live separately in the womb of its mother and can live and exist as an independent *person* if born in that stage." *Id.* at 355, 99 N.W.2d at 170 (emphasis added). Thus, for the first time, we see a Wisconsin court favorably considering a legal theory which recognizes the ability of a viable fetus to exist as an independent person and to assert a claim, after birth, based on that status.

Second, referring to the abortion law then on the books, the *Puhl* court noted that the purpose of the laws against abortion is founded on the public policy that it is wrong to deprive a living fetus of its ability to be born. *Id.* at 356, 99 N.W.2d at 170. The *Puhl* court rhetorically inquired, "If an unborn child may not be legally deprived of life, why may that life be impaired by the negligence of another person without responsibility?" *Id.* at 356-57, 99 N.W.2d at 170. Although that statement was uttered in a pre-*Roe v. Wade* setting, a variant of that rhetorical question is legitimately posed in this case as to those abortions which remain illegal under *Roe*. If the viable fetus, within the constraints of *Roe*, may not be deprived of life, how can it be reasonably said that the state is powerless under the CHIPS law to protect a viable fetus whose physical safety or life is at risk?

Third, the *Puhl* court observed that "[t]he protection of property rights of an unborn child in the law of real property ... and [probate] ... raises the question of whether property rights should be more important

555

than the right to be compensated for being born deformed or injured through the negligence of another." *Puhl*, 8 Wis. 2d at 357, 99 N.W.2d at 171. That same concern applies in this case. The law cannot credibly say that the property and inheritance rights of a fetus are more important than the ability of the state to intercede under CHIPS on behalf of a viable fetus to protect the fetus against serious threats to its physical safety or life.

We next turn to *Kwaterski*. There the issue was "whether an eighth-month, viable unborn child, whose later stillbirth is caused by the wrongful act of another, is a 'person' within the meaning of [the wrongful-death statute] so as to give rise to a wrongful-death action by the parents of the stillborn infant." *Kwaterski*, 34 Wis. 2d at 15, 148 N.W.2d at 108. In allowing recovery, the supreme court noted that "the weight of authority continues the trend noticed in *Puhl*, favoring recognition of an unborn child as a *person* for purposes of recovery under a wrongful-death statute." *Kwaterski*, 34 Wis. 2d at 19, 148 N.W.2d at 110 (emphasis added).

The *Kwaterski* court cited various reasons in support of its ruling allowing recovery. Many are relevant to this case and support our holding. First, echoing *Puhl*, the court said that a viable child "is capable of independent existence and therefore should be recognized as a separate entity entitled to the protection of the law of torts." *Kwaterski*, 34 Wis. 2d at 19, 148 N.W.2d at 110. In fact, the court said that *Puhl* recognized an unborn child as a separate legal entity. *Kwaterski*, 34 Wis. 2d at 19, 148 N.W.2d at 110. While we are not so sure that *Puhl* made such an unequivocal

statement, it is clear that *Kwaterski* does for purposes of the wrongful-death statute.[12]

Angela necessarily concedes that under *Kwaterski*, a viable fetus is a person for purposes of the wrongful-death statute. Yet, she would deny that same status to a viable fetus under the CHIPS statute so as to preclude the state from taking protective steps on behalf of a viable fetus at risk. This reasoning is illogical. It holds that the survivors of a fetus may be compensated for the fetus' death, but the state may not intercede under CHIPS to preserve the life or safety of the fetus in the first instance. This reasoning produces an unreasonable interpretation of the CHIPS statute in light of *Kwaterski*. We must look to the commonsense meaning of a statute to avoid unreasonable results. *Turner v. City of Milwaukee*, 193 Wis. 2d 412, 420, 535 N.W.2d 15, 17 (Ct. App. 1995).

Second, the *Kwaterski* court, again echoing *Puhl*, noted that the law already protected the unborn against the crimes of others and the property rights of the unborn. *Kwaterski*, 34 Wis. 2d at 19, 148 N.W.2d at 110. We have previously addressed these considera-

---

[12] The wrongful-death statute under inquiry in *Kwaterski v. State Farm Mut. Auto Ins. Co.*, 34 Wis. 2d 14, 148 N.W.2d 107 (1967), read, in part, as follows:

> Whenever the death of a *person* shall be caused by a wrongful act, neglect or default and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who . . . would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death of the person injured.

Section 331.03, STATS., 1963 (emphasis added).

With minor variances, Wisconsin's current wrongful-death statute, § 895.031, STATS., mirrors the statute examined by the *Kwaterski* court.

tions and noted the incongruity of recognizing those rights but not according the state its authority under *Roe* to intercede via CHIPS on behalf of a viable fetus.

Third, the *Kwaterski* court observed that "[i]f no right of action is allowed, there is a wrong inflicted for which there is no remedy." *Kwaterski*, 34 Wis. 2d at 20, 148 N.W.2d at 110. Our failure to recognize the viable fetus as a person under the CHIPS statute effectively deprives the state of its remedy, recognized by *Roe* and codified by the CHIPS law, to pursue its legitimate and compelling interest in protecting the potential life represented by a viable fetus. *See Roe*, 410 U.S. at 154; *see also* § 48.13, STATS.

Fourth, the *Kwaterski* court cited equitable grounds in support of its holding. The court concluded that it would be unfair to deny the surviving family members the right to recover monetary damages for the loss of a child before it is born. *See Kwaterski*, 34 Wis. 2d at 20, 148 N.W.2d at 111. If equity requires that a viable fetus be accorded status as a "person" so that third parties might be compensated, it surely follows that the viable fetus be accorded similar status under the CHIPS statute to allow the state to pursue its legitimate interest in protecting the physical safety or life of a viable fetus.

Fifth, in terse but clear language, *Kwaterski* rejected the argument that any judicial declaration that a viable fetus is a "person" within the meaning of the wrongful-death statute was a matter for the legislature, not the courts. Angela mounts the same argument here as to the CHIPS statute. The *Kwaterski* court stated, "[Wrongful-death statutes] are remedial statutes and should be broadly construed to effect their purpose." *Id.* at 21, 148 N.W.2d at 111.

A remedial statute is one which affords a remedy, or improves or facilitates remedies already existing for the enforcement of rights and redress of injuries. *Chappy v. LIRC*, 128 Wis. 2d 318, 324, 381 N.W.2d 552, 556 (Ct. App. 1985), *aff'd*, 136 Wis. 2d 172, 401 N.W.2d 568 (1987). Clearly, the purpose of the CHIPS statute is to allow the state to intervene on behalf of children at risk. As such, the statute is remedial. Following *Kwaterski*'s directive, we construe the statute in a fashion to serve those goals.

*Kwaterski* recognizes the parental choice to conceive and bear a child. The purpose of the wrongful-death statute is to compensate for the in utero loss of such child which is caused by the wrongful act of another. To achieve the remedial goal of the statute, the supreme court read the term "person" broadly to include a viable fetus. In this case, the purpose of the CHIPS statute is to vest the state with the authority to promote the health and welfare of children, a goal which includes a viable fetus under *Roe*. To achieve this remedial goal, we properly construe a viable fetus as a "person" under the juvenile code.

We conclude this phase of our discussion by returning to *Roe*. We have already noted that defining a viable fetus as a "person" for purposes of § 48.02(2), STATS., does no violence to the choice holding of *Roe*. Neither does our conclusion offend *Roe*'s further holding that a fetus is not a "person" within the meaning of the Fourteenth Amendment. *See Roe*, 410 U.S. at 158. We are not declaring Angela's viable fetus a person under the Constitution. Rather, we are holding that the viable fetus qualifies as a person under the statutory definition of child set out in § 48.02(2), STATS.[13]

---

[13] On this point, one commentator has offered the following thoughts:

In summary, we conclude that Angela's viable fetus is a "person who is less than 18 years of age" pursuant to § 48.02(2), STATS. As such, the viable fetus is a child entitled to the protections and services of § 48.13(10), STATS., and the juvenile court has subject matter jurisdiction to adjudicate the pending CHIPS proceeding.

### 2. *Personal Jurisdiction over the Viable Fetus*

Next, Angela contends that the juvenile court does not have personal jurisdiction over her viable fetus.[14] Personal jurisdiction inquires whether a party has a sufficient relationship to the jurisdiction exercising authority and whether the party has notice of the

> In *Roe v. Wade*, the Supreme Court stated "that the word 'person,' as used in the Fourteenth Amendment, does not include the unborn." This statement must be placed in context, however, because its seeming clarity has caused serious confusion. The statement is narrow. It pertains only to the word "person" as it appears in the fourteenth amendment. It does *not* imply that the unborn are non-persons in other legal contexts. For example, *Roe* does nothing to weaken the large body of existing law protecting the unborn, and denial of fourteenth amendment personhood does not deprive the states of power to grant legal recognition to the unborn in non-fourteenth amendment situations. Unfortunately, *Roe* is sometimes misunderstood as an all-pervasive statement of "non-personhood" of the unborn. This misunderstanding leads some to conclude that states are powerless to protect the fetus. [Emphasis in original; footnote omitted.]

John E.B. Myers, *Abuse and Neglect of the Unborn: Can the State Intervene?* 23 DUQ. L. REV. 1, 15 (1984).

[14] In addressing this issue, we are assuming that Angela has standing to object to the juvenile court's personal jurisdiction over her viable fetus.

charges. *State v. Smith*, 131 Wis. 2d 220, 239, 388 N.W.2d 601, 609 (1986).

The fetus appeared in this action through its guardian ad litem, and in response to the CHIPS petition and the protective custody order. The guardian ad litem has not objected to the court's personal jurisdiction over the fetus. Nor has the guardian ad litem claimed that the fetus has a relationship to any jurisdiction other than Wisconsin or that there is any defect regarding notice of the proceedings. Thus, all the requisites for personal jurisdiction have been satisfied as to the viable fetus.

### 3. *Personal Jurisdiction over Angela*

Next, Angela challenges the juvenile court's personal jurisdiction over her.

We stress at the outset of this discussion that the jurisdictional issue presented by this case is the juvenile court's *original jurisdiction* pursuant to the CHIPS statute, § 48.13, STATS. "The court has exclusive original jurisdiction over a child alleged to be in need of protection or services . . . ." *Id.* The statute then goes on to recite the fourteen various scenarios under which the court may exercise its jurisdiction to provide protection and services. Thus, the statute states a threshold jurisdictional requirement before the juvenile court may act in a CHIPS matter.

It is critical to note that *the statute neither confers nor requires original jurisdiction over a parent as a prerequisite to a CHIPS proceeding.* This is a subtle, but important, distinction which Angela has failed to grasp. As a result, she rests her argument on the incorrect premise that the juvenile court has exercised its

original jurisdiction *over her*. This is not so. Section 48.13, STATS., which vests the juvenile court with original jurisdiction to act in a CHIPS case, does not require original jurisdiction over a parent, and the juvenile court has not asserted any original jurisdiction over Angela.

The same is true as to the protective custody order. Like the CHIPS statute, § 48.19, STATS., which authorizes protective custody orders, neither requires nor confers original jurisdiction over a parent. Under the facts of this case, the jurisdictional requirement for issuance of the protective custody order was a showing that the welfare of the viable fetus demanded immediate removal of its custody to a safer environment. *See* § 48.19(1)(c). This threshold showing was made to the satisfaction of the juvenile court.

The protective custody order also recognized that the custody of Angela's viable fetus would, of necessity, require the concurrent custody of Angela herself. The order worked its custodial effect on Angela not because the juvenile court has asserted jurisdiction over her, but because Angela and her fetus are physically and biologically one. While the law has recognized the separate and sometimes competing legal interests of a fetus and its mother, this inexorable law of nature cannot be overlooked in this jurisdictional context.

This does not mean that parents are not interested parties in CHIPS and protective custody proceedings. To the contrary, they are vital and important participants with vital and important rights, interests and responsibilities. And, the juvenile code involves the parents in such proceedings *after* original jurisdiction has been established and after the child has been taken into custody. However, the bottom line for purposes of

this jurisdictional discussion is that neither the juvenile court's original exclusive CHIPS jurisdiction nor the court's authority to issue a protective custody order requires prior original jurisdiction over a parent.

This same reasoning governs Angela's further argument that our holding runs afoul of this court's decision in *C.S. v. Racine County*, 137 Wis. 2d 217, 404 N.W.2d 79 (Ct. App. 1987). There we held that a juvenile court could not order a parent of a born child into involuntary inpatient substance abuse treatment pursuant to § 48.45, STATS. *C.S.*, 137 Wis. 2d at 223-24, 404 N.W.2d at 82-83. Instead, we held that the state was obligated to follow the commitment proceedings of ch. 51, STATS., governing alcohol and substance abuse commitments. *C.S.*, Wis. 2d at 224, 404 N.W.2d at 82-83.

This is not a *C.S.* case because just as the juvenile court has not asserted any jurisdiction over Angela, neither has it ordered Angela into any involuntary inpatient treatment program or facility. As we have noted, both the original and amended protective custody orders directed that the viable fetus, not Angela, be taken into nonsecure custody.

The fact that Angela and her viable fetus are physically and biologically one triggers the legal dilemma posed by this case, and it runs through all of the issues before us. This fact requires this court to squarely decide whose interests shall prevail. However, we conclude that the answer to this delicate question does not lie in any inquiry as to the juvenile court's purported personal jurisdiction over Angela. Rather, we properly address this question in the context of Angela's constitutional arguments—a matter to which we now turn.[15]

---

[15] Because we hold that the juvenile court did not exercise any original jurisdiction over Angela, we need not address with finality the County and guardian ad litem's further argument

## DUE PROCESS/EQUAL PROTECTION

Assuming that the juvenile court had jurisdiction to act, Angela next contends that the custodial effect worked by the protective custody order violates her due process liberty rights under the United States and Wisconsin constitutions.[16] Specifically, Angela contends that the County has failed to demonstrate a sufficient compelling interest on which to restrain her liberty.

On this issue, *Roe v. Wade* and its progeny again play an important role. As we have previously observed, *Roe* not only recognized a woman's right to choose an abortion, but also the state's compelling interest in promoting and protecting the potential life of a viable fetus. *Roe*, 410 U.S. at 154; *see also Planned Parenthood v. Casey*, 505 U.S. 833, 869 (1992). As

---

that § 48.45, STATS., may serve as a basis for the juvenile court's jurisdiction over Angela.

Nonetheless, we make some observations, admittedly dicta, about § 48.45, STATS. The statute is entitled "Orders applicable to adults." It authorizes the juvenile court "in the hearing of a [CHIPS] case" to "make orders with respect to the conduct of such person in his or her relationship to the child." Subsection (1)(a). However, this statute does not address the juvenile court's *original jurisdiction*, which is the issue before us. If the viable fetus was a born child, and Angela was engaging in conduct detrimental to the child's safety, we doubt that a juvenile court could issue a detention order against Angela pursuant to this statute. Moreover, the statute appears to envision the custody of an adult only after a contempt proceeding has occurred. Subsection (2).

[16] Despite her invocation of the Wisconsin Constitution, all of Angela's arguments rest on cases which have considered the federal Constitution. Angela makes no separate argument under the Wisconsin Constitution. Therefore, we will not separately address any possible different implications of the Wisconsin Constitution on the issue.

*Casey* later stated, "it must be remembered that *Roe v. Wade* speaks with clarity in establishing not only the woman's liberty but also the State's 'important and legitimate interest in potential life.' That portion of the decision in *Roe* has been given too little acknowledgement and implementation by the Court in its subsequent cases." *Casey*, 505 U.S. at 891 (citation omitted). Thus, a woman's constitutional right to choose an abortion is not absolute. *See Roe*, 410 U.S. at 154.

We also note that the state interest recognized by *Roe* and later cases is not of constitutional proportion since the state possesses no such interests or rights. Nor is the state's interest recognized by *Roe* predicated on any constitutional right of the fetus, since *Roe* held that the fetus was not a person within the meaning of the Fourteenth Amendment. *Roe*, 410 U.S. at 158. Nonetheless, the Supreme Court concluded that these *nonconstitutional interests were sufficient, after viability, to override the constitutional right to choice. See id.* at 158-59.

■■■■

In order to deprive a person of the fundamental right to physical liberty, the state must show a compelling interest and that the means to carry it out is narrowly drawn. *See Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). *Roe* has already recognized this "compelling interest" in situations involving the potential life of a viable fetus. The substantial number of children who are born drug addicted or drug exposed is well documented. *See, e.g.*, Lisa Janovy Keyes, Comment, *Rethinking the Aim of the "War on Drugs": States' Roles in Preventing Substance Abuse by Pregnant Women*, 1992 WIS. L. REV. 197, 201. ("A recent nationwide study revealed that an average of 11% of all babies born

tested positive for illicit drugs . . . . Wisconsin's perinatal substance abuse problem mirrors the national experience. In Milwaukee County, 10% to 15% of babies are born to mothers who used cocaine during pregnancy.") These statistics factually establish the compelling need for state intervention, and *Roe* legally establishes the state's right to do so.

Angela further argues that the state's interest is not compelling because it might be asserted in instances where the risk to the fetus is minimal or perhaps nonexistent. As examples, she cites to a pregnant woman who smokes tobacco or consumes nominal amounts of alcoholic beverages while pregnant.

In a different setting, this court once rejected an argument based upon our speculation about the possible mischief which that argument, if adopted, would work in future hypothetical cases. *Manitowoc County v. Local 986B*, 163 Wis. 2d 911, 918, 472 N.W.2d 600, 602 (Ct. App. 1991) ( *Local 986B I*), *rev'd*, 168 Wis. 2d 819, 484 N.W.2d 534 (1992) (*Local 986B II*). In reversing our decision, the supreme court labelled our concerns "hyperbolic." *Local 986B II*, 168 Wis. 2d at 831, 484 N.W.2d at 538-39. Although Angela presents many compelling arguments in this case, her argument on this issue borders on the hyperbolic.

An objective and fair reading of the CHIPS statute reveals why this is so. The fourteen scenarios in which the CHIPS statute authorizes the juvenile court to exercise its original jurisdiction represent *egregious* situations in which a child is at *substantial or serious* risk either because of its own actions or those of others. These include a child without a parent; an abandoned child; a child who has been the victim of sexual abuse or who is at such risk; a child who has needs for special treatment or care; a child who is receiving inadequate

care during a time when a parent is absent or unavailable; a child whose parent is neglecting, or is at substantial risk of neglecting, to provide necessary care; a child who is suffering from emotional damage, alcohol or other drug abuse impairment for which the parent is unwilling to provide treatment; and a delinquent child found not responsible because of mental disease or defect. Section 48.13, STATS.

This litany hardly suggests the lesser kinds of risk situations about which Angela hypothesizes. Instead, these statutory scenarios represent those extreme and critical situations in which the juvenile court may intercede to protect a child and to provide services to the child and the family. No parent is perfect. All parents, at one time or another, have probably acted in a careless or negligent fashion as to their children. All parents could probably do better. But the CHIPS statute does not exist to allow the state to meddle with the family unit in those instances in which the parental conduct represents expected and routine human failings. Rather, the statute is reserved for extreme situations in which the child faces serious or substantial risk.

Moreover, the juvenile court may not invoke its jurisdiction on a mere hunch or suspicion. Section 48.255(1)(e), STATS., provides that a CHIPS petition must recite "reliable and credible information which forms the basis of the allegations necessary to invoke the jurisdiction of the court." The test for the sufficiency of a CHIPS petition is the same as that governing the sufficiency of criminal complaints—probable cause. *State v. Courtney E.*, 184 Wis. 2d 592, 601, 516 N.W.2d 422, 425 (1994).

In addition, § 48.13(10), STATS., the subsection upon which the County relies in this case, requires not only that the parent neglect to provide the child with the requisite care, *but also* that such neglect *seriously endanger* the physical health of the child.

We also note that in a case in which a protective custody order is sought, the law accords additional protections besides the foregoing jurisdictional requirements. Before the juvenile court may issue a custodial order, it must be persuaded "upon a showing satisfactory to the judge that the welfare of the child *demands* that the child be immediately removed from his or her present custody." Section 48.19(1)(c), STATS. (emphasis added). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 598 (1976), defines the verb "demand[s]," in part, as "necessary, or requisite: make imperative." This same authority likens the term to a "fact of necessity or compulsiveness." *Id.* Thus, a protective custody order is properly reserved for situations of urgency or exigency.

Finally, we observe that following the execution of a protective custody order, § 48.205, STATS., requires a further probable cause determination as to whether the child may continue to be held in custody, and the statute sets out various criteria for the juvenile court or the intake worker to consider on this question.

From this analysis of the applicable CHIPS and protective custody statutes, it is apparent that the law provides numerous procedures, standards and protections which guard against the hypothetical abuses which Angela envisions.[17]

---

[17] In addition, we are entitled to presume that those lawyers and judges charged with administering a law will do so

Angela further argues that the confinement of pregnant women is too extreme a means by which the state may accomplish its compelling interest. As such, she contends that the statute is not constitutionally tailored to serve the state's objective. *See Zablocki*, 434 U.S. at 388. Angela argues that confinement will be counterproductive, forcing some women to avoid prenatal medical care, to opt for delivery outside of a medical setting, or to avoid substance abuse treatment. She contends that other less coercive alternatives, such as treatment and counseling, should be explored and employed.

We do not disagree with Angela that the pursuit of alternatives short of a protective custody order would be prudent in many cases. However, in her zeal to invalidate the statute, Angela has failed to recognize that the juvenile code already promotes and allows the exploration of these lesser options. Section 48.01(1), STATS., which recites the legislative purposes of the juvenile code, provides, in part:

> This chapter shall be interpreted to effectuate the following express legislative purposes:
>
> . . . .
>
> (b) To provide for the care, protection and wholesome mental and physical development of children, *preserving the unity of the family whenever possible*.
>
> . . . .
>
> (g) To provide children in the state with *permanent and stable family relationships*. The courts and agencies responsible for child welfare should *assist parents in changing any circumstances in the*

---

with discretion, good judgment and prudence. Even when that presumption is not borne out in a given case, such does not render the law unwise or unconstitutional.

569

*home which might harm the child or which may require the child to be placed outside the home.* [Emphasis added.]

The goal of preserving the family unit clearly conveys that protective custody orders should be used sparingly. That goal also conveys that the option of voluntary drug treatment for pregnant women should be explored. And, the juvenile code has provisions incidental to the intake process where options short of formal juvenile court intervention and a protective custody order can be explored. *See, e.g.,* §§ 48.067, 48.069, 48.24, 48.243, 48.245, STATS. Thus, the position which Angela advocates is already accommodated by the juvenile code.

While the limited record before us in this original action does not reveal whether lesser options were explored on the juvenile court level, the record does establish that they were explored and recommended to Angela by her treating obstetrician. It was Angela's failure to heed this advice—not any surreptitious act of the juvenile court—which triggered the need for judicial intervention by means of a CHIPS petition and a protective custody order.

This analysis establishes that the CHIPS statute is not an enactment which has "no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them." *See United States v. Jackson,* 390 U.S. 570, 581 (1968). To the contrary, the CHIPS statute represents the state's recognized interest in promoting and protecting the safety and well-being of children.

We recognize that the means by which the state interest is served cannot be justified merely because there is a rational relationship between the means and

570

the interest; rather, the state interest must be *compelling*. *See Reno v. Flores*, 507 U.S. 292, —, 113 S. Ct. 1439, 1447 (1993). However, *Roe* has already decided that the state's interest in promoting the life of a viable fetus is compelling, and we have already held that our CHIPS statute represents the choice of the state to promote that interest as to a viable fetus. We therefore conclude that §§ 48.13 and 48.19, STATS., the means by which the state's interest is served, are properly tailored to satisfy constitutional requirements.[18]

## *CONCLUSION*

We hold that Angela's viable fetus is a "person" as that term is used in the statutory definition of a "child" set out in § 48.02(2), STATS. We further hold that all components of the juvenile court's exclusive original jurisdiction have been satisfied in this case. Therefore, the juvenile court was authorized to adjudicate the CHIPS matter and to issue a protective order for the custody of the viable fetus pursuant to § 48.19(1)(c), STATS. Finally, we hold that the CHIPS statute and the protective custody provisions of § 48.19(1) represent a proper and tailored means by which the State may exercise its compelling interest in promoting the health, safety and welfare of Angela's viable fetus.

*By the Court.*—Writ of habeas corpus denied. Supervisory writ denied.

---

[18] Angela also argues that our holding violates her equal protection rights. However, she bases this on the same arguments in support of her due process claim. Since we have rejected those due process arguments, we do not further address the equal protection issue.

ANDERSON, P.J. (*dissenting*). Although I dissent, I do not approve the moral quality of Angela M.W.'s conduct. I do not, under any circumstances, sanction the use of cocaine by a pregnant woman, who has been repeatedly warned of the risks to her fetus, at any time during her pregnancy. Nor, on the other hand, am I here to criticize her for giving in to what may well have been the unyielding demands of her addiction.

I write separately only after having answered in the affirmative the "searching question whether [this dissent] is likely to serve the law by extracting from the shadows the problems left unstated and the theories that should eventually control." Roger Traynor, *Some Open Questions on the Work of State Appellate Courts,* 24 U. CHI. L. REV. 211, 218, (1957), *reprinted in* RUGGERO J. ALDISERT, OPINION WRITING, 171 (1990).

The majority narrows the principal issue to a question of statutory construction: Whether a viable fetus is included in the definition of "child" in § 48.02(2), STATS., and, hence, within the jurisdiction of the juvenile court. Notwithstanding my disagreements with the majority's thorough and scholarly analysis in support of its conclusions, I do agree with its dispassionate approach of avoiding a religious, philosophical or biological discussion of when a "life" begins.

I.

The basic principle espoused by Waukesha County is that Angela M.W.'s use of cocaine during pregnancy is fetal abuse. Since Wisconsin does not have a statute dealing with fetal abuse, Waukesha County argues that fetal abuse is equivalent to child abuse under § 48.13, STATS.

The fetal abuse-child abuse polemic is the crucial argument used to justify state intervention in maternal conduct. The argument is attractive. Since parents cannot violate their duty to care for their children, even at the expense of personal religious value, then mothers should not be able to refuse care necessary for the fetus. This is the prenatal equivalent of child neglect or abuse. However, lurking beneath the facade of this argument are insidious and alarming implications. "Fetal neglect" implies that there is some legally cognizable duty to the fetus. Although a child is a "person" physically separate from its mother, the fetus is inseparably tied to its mother and is not a "person" as used in the Fourteenth Amendment. Thus, what the state must do to end "fetal neglect"—physically invade the maternal barrier—is entirely different than what it may do to end child neglect. The analogy drawn between the two issues is erroneous. [Footnotes omitted.]

James J. Nocon, *Physicians and Maternal-Fetal Conflicts: Duties, Rights and Responsibilities*, 5 J. L. & HEALTH 1, 31-32 (1990-91).

## II.

The majority holds that § 48.02(2), STATS., is ambiguous because reasonable minds would differ as to whether the statutory definition of a "child" applies to a viable fetus in a CHIPS proceeding. The majority concludes that a viable fetus is a "person" within the definition of a "child" in § 48.02(2). It finds support for this conclusion in three sources: (1) certain Wisconsin cases that have considered "fetal rights"; (2) the legislature's enactment of the juvenile code; and, (3) *Roe v. Wade*, 410 U.S. 113 (1973), and its progeny. Majority op. at 550.

## A.

The common law and common sense lead me to conclude that the statute is not ambiguous on its face or as applied. Section 48.02(2), STATS., defines a "child" to mean "a person who is less than 18 years of age." This definition sets eighteen years of age as the ceiling on the exclusive jurisdiction of the juvenile court, but it also sets the day of birth as the floor on that jurisdiction. In deciding that the juvenile court lacked subject-matter jurisdiction over a juvenile who committed an offense the day immediately preceding his eighteenth birthday, one court has written: "[A]t common law a person reaches his or her next year in age at the first moment of the day prior to the anniversary date of his or her birth." *In re Edward*, 441 A.2d 543, 543 (R.I. 1982). Therefore, under the common law the birth event is significant because that is the time from which the common law calculates age. Common sense requires the same result. In everyday affairs, age is measured from the time of birth, not conception, not quickening and not viability, and one cannot be a "child" by definition until he or she has been born and his or her age has begun to accrue. *See In re Valerie D.*, 613 A.2d 748, 760 (Conn. 1992).

The statutory definition of a "child" is unambiguous on its face and as applied. A "child," subject to the exclusive jurisdiction of the juvenile court, is any being from the moment of the birth event until his or her eighteenth birthday. Ambiguity is created when it is held that there is no floor to the definition of a "child" and the juvenile court can have jurisdiction over a fetus in utero. The ambiguity is in the uncertainty as to when the jurisdiction is triggered. If jurisdiction is triggered when the fetus becomes viable, there is no fixed time when this event takes place. Viability is generally

defined as that state of fetal development when the fetus is able to maintain life outside of the womb. *See* Lawrence J. Nelson, Brian P. Buggy, and Carol J. Weil, *Forced Medical Treatment of Pregnant Women: "Compelling Each to Live as Seems Good to the Rest*," 37 HASTINGS L.J. 703, 715 (May 1986) [hereinafter Nelson I]; *see* § 940.15(1), STATS. This is not a fixed event like a birth; for each fetus it will depend upon its development and whether artificial support is required. This is not an observable event like a birth; for each fetus it will depend upon the judgment of attending physicians and expert witnesses.

Rather than be certain about its jurisdiction, the juvenile court will have to conduct a hearing to gather all of the relevant evidence, weigh the credibility of the expert witnesses and make a medical judgment that the fetus has reached the stage of development called "viability" before it can make the legal judgment that it has jurisdiction. On the other hand, the unambiguous application of § 48.02(2), STATS., to trigger jurisdiction upon the fixed and observable event of birth removes all uncertainty.

## B.

I am not persuaded by the majority's argument that under the rationale of *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 148 N.W.2d 107 (1967), a viable fetus is accorded status as a person under the CHIPS statutes to protect its physical safety or life. Majority op. at 557-58. I am persuaded by the discussion in *Roe*, 410 U.S. at 161, about the law's reluctance to bestow "legal rights to the unborn except in narrowly defined situations and except when the rights are contingent upon live birth." In discussing states that permit parents to recover for the wrongful

death of a stillborn child, the Supreme Court wrote, "Such an action, however, would appear to be one to vindicate the parents' interest and is thus consistent with the view that the fetus, at most, represents only the potentiality of life." *Id.* at 162.

One commentator writes that the law of property,[1] torts[2] and wrongful death statutes suggest several conclusions that can be drawn about the fetus. Nelson I, 37 HASTINGS L.J. at 738-39; *see* Lawrence J. Nelson & Nancy Milliken, *Compelled Medical Treatment of Pregnant Women; Life, Liberty and Law in Conflict*, 259 JAMA 1060, 1062-63 (1988) [hereinafter Nelson II]. First, although it is certain that the fetus is not a person under the law, the law undeniably recognizes that the fetus has certain rights—inheritance—and is entitled to certain tort protections if born alive—recovery for prenatal injuries. Second, the legal rights given to a fetus are largely determined by the purposes of the particular law in question, rather than by a particular philosophical view of fetal "personhood." The commentator completes his analysis by concluding that "the variable legal treatment of a fetus is explained and

---

[1] "[P]roperty law does not confer the full rights of personhood upon the fetus. Instead, it creates a means of fulfilling the intentions of testators by protecting the right of a fetus to inherit property upon live birth." Lawrence J. Nelson, Brian P. Buggy, and Carol J. Weil, *Forced Medical Treatment of Pregnant Women: "Compelling Each to Live as Seems Good to the Rest,"* 37 HASTINGS L.J. 703, 730 (May 1986) [hereinafter Nelson I].

[2] "Judicial recognition of a live-born child's right to recover damages for tortious prenatal injury does not mean that courts recognize unborn fetuses as persons with full legal rights. Instead, this practice focuses on the need for compensation of a living person wrongfully injured rather than on the legal status of the fetus." Nelson I, 37 HASTINGS L.J. at 733.

justified by the particular social policies underlying different areas of law." Nelson I, 37 HASTINGS L.J. at 739. He points out that the law is not being pernicious or arbitrary; rather, the law "simply reflects social values and policies taken into account by lawmakers." *Id.*

I conclude that those Wisconsin cases which impose limited legal duties upon persons toward a fetus and grant limited legal rights to a fetus cannot be read to confer full legal status upon a fetus. Rather, each case must be carefully examined to identify the social values and policies of the law that is being promoted.

## C.

I do not read *Roe* and its progeny to support the conclusion that the State may act to promote its interests in the potential of human life by intervening to protect the fetus in the event of harmful behavior by the mother. Majority op. at 558. There is a Latin maxim that can be applied: *Nemo enim aliquam partem recte intelligere possit antequam totum iterum atque iterum perlegerit.*[3] *Roe* and its progeny are cases that considered a woman's right to an abortion and the authority of the states to reasonably restrict that right. *Roe*'s recognition of an important and legitimate state interest in the potential of human life must be read against the backdrop of the issue before the Supreme Court. I believe that the Supreme Court carefully limited this important and legitimate state interest:

> With respect to the State's important and legitimate interest in potential life, the "compelling" point is at viability. This is so because the fetus then

---

[3] "No one can rightly understand one part before he has again and again read the whole."

presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications. If the State is interested in protecting fetal life after viability, *it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.* [Emphasis added.]

*Roe*, 410 U.S. at 163-64.[4]

Waukesha County relies on *Jefferson v. Griffin Spalding County Hosp. Auth.*, 274 S.E.2d 457, 460 (Ga. 1981), and its interpretation of *Roe* that "the state has an interest in protecting the lives of unborn, viable children." I believe that Waukesha County is wrong when it argues that *Roe* supports the intervention of the state and the compulsory detention of a mother for the sake of the health and well-being of the fetus. Equally wrong is a derivation of Waukesha County's argument that because a woman has waived her right to an abortion after carrying the pregnancy beyond the point of viability, the state can force her to accept treatment for the benefit of the fetus.

This misinterpretation of the law set forth in *Roe* is probably the most common and serious oversight made in the debate about maternal-fetal conflict. While it is true that *Roe* acknowledged the state's compelling interest in the fetus at viability, it

---

[4] One commentator writes that even though the United States Supreme Court has recognized that the well-being of the fetus is a legitimate state interest, it "has not declared that interest superior to the mother's due process rights. *Roe* is still the rule on this point and refuses to elevate the common law interests in the fetus to a constitutional right." James J. Nocon, *Physicians and Maternal-Fetal Conflicts: Duties, Rights and Responsibilities*, 5 J. L. & HEALTH 1, 16 (1990-91).

placed an essential limit on the exercise of this interest by expressly permitting a woman to obtain an abortion even after fetal viability if "it is necessary to preserve (her) life or health." Thus, it is incorrect to assert that *Roe* grants the state unrestricted authority to protect the viable fetus or to prohibit abortions after viability. Furthermore, *Roe* simply permits, but does not compel, states to forbid abortions after viability when the mother's life or health is not thereby compromised. In addition, *Roe* says nothing about whether the state may force treatment on a woman to promote fetal health.

Nelson II, 259 JAMA at 1062.[5]

Nelson goes on in this article to examine other cases in the same genre as *Roe: Doe v. Bolton,* 410 U.S. 179 (1973); *Colautti v. Franklin,* 439 U.S. 379 (1979); and *Thornburgh v. American College of Obstetricians*

---

[5] I find support for Nelson's conclusions in *Planned Parenthood v. Casey,* 505 U.S. 833, 872 (1992), where the lead opinion explains *Roe*'s trimester framework:

> Roe established a trimester framework to govern abortion regulations. Under this elaborate but rigid construct, almost no regulation at all is permitted during the first trimester of pregnancy; regulations designed to protect the woman's health, but not to further the State's interest in potential life, are permitted during the second trimester; and during the third trimester, when the fetus is viable, prohibitions are permitted *provided the life or health of the mother is not at stake.* [Emphasis added.]

In *Casey,* the Supreme Court abandons this trimester framework in favor of an undue burden analysis that the plurality believes will protect the central right recognized in *Roe* and accommodate the state's profound interest in potential life. *Casey,* 505 U.S. at 878. In doing so, the plurality makes it clear that unnecessary health regulations on the exercise of the right to an abortion would be an undue burden. *Id. Casey* reaffirms that the state's profound interest in potential life cannot override the preservation of the health of the mother. *Id.*

*and Gynecologists,* 476 U.S. 747 (1986), *overruled by Planned Parenthood v. Casey*, 505 U.S. 833 (1992). He reaches a conclusion that is critical of Waukesha County's argument; Nelson asserts that "when the health interests of a woman and her fetus conflict, the state appears to be constitutionally bound to place the woman's interests above the fetus'."[6] Nelson II, 259 JAMA at 1062.

The discussion of *Roe* and its progeny is not meant to be a distraction from the narrow issue in this case. Rather, these cases are instructive on the resolution of the maternal-fetal conflict created whenever the state seeks to intervene during a pregnancy for the best interest of the fetus. Because these cases focus on attempts of the state to restrict a woman's right to an abortion—in violation of her privacy rights, *Roe,* or in violation of her liberty interest, *Casey*—the impact of the County's arguments premised on the State's profound interest in the potential of life justifying intervention into a woman's pregnancy is substantially lessened. These cases establish that the state's profound interest in the potential of life is not absolute

[6] To understand this conclusion, it is necessary to know the premises relied upon by the author. The first premise is his suggestion that "abortions after fetal viability cannot be totally forbidden by the state because the woman's interest in the preservation of her life and health is superior to the state's 'compelling interest' in the preservation of viable fetal life." His second premise is that the central holding of *Colautti v. Franklin*, 439 U.S. 379 (1979), is that "statutes that require a trade-off between the woman's health and fetal survival are unconstitutional." Lawrence J. Nelson & Nancy Milliken, *Compelled Medical Treatment of Pregnant Women; Life, Liberty and Law in Conflict,* 259 JAMA 1060, 1062 (1988) [hereinafter Nelson II].

and the rights of the mother must be carefully considered and jealously guarded.

## III.

I dissent because I believe that the issue in this case presents so many unknown consequences that this court should have declined to engage in the statutory interpretation that results in fetuses being brought under the jurisdiction of the juvenile court. A court which seeks the truth through the adversarial process is ill-equipped to make public policy in the sensitive areas surrounding maternal-fetal conflicts.

I dissent because I believe that the legislature is better equipped to explore the burdens that the decision to extend the jurisdiction of the juvenile court to a fetus in utero would have on women as a group without being unduly swayed by the lamentable facts of a single case. "A separate state statute directed toward improving the health of newborns could address the complex legal and moral issues surrounding inadequate prenatal care more effectively than could a court attempting to apply a preexisting statute designed for a different purpose." Note, *Developments—Medical Technology and the Law,* 103 HARV. L. REV. 1519, 1575 (1990).

In a comprehensive and well-written opinion declining to approve the surgical sterilization of a severely retarded adult female, Chief Justice Nathan J. Heffernan set out in detail the reasons why courts are so ill-equipped to address social issues of statewide concern.

> This case demonstrates that a court is not an appropriate forum for making policy in such a sensitive area. Moreover, irrespective of how well tried a case may be—and we consider the instant one to have

been well presented and carefully considered—there are inherent limitations in the factual posture of any case which make the extrapolation of judicially made policy to an entire area of such a sensitive nature as this risky indeed. The legislature is far better able, by the hearing process, to consider a broad range of possible factual situations. It can marshal informed persons to give an in-depth study to the entire problem and can secure the advice of experts in the field of psychology, psychiatry, sociology, and medicine, as well as in the field of law, to explore the ramifications of the adoption of a general public policy which will give specific imprimatur to the courts to order sterilization in well defined circumstances.

*Eberhardy v. Circuit Court,* 102 Wis. 2d 539, 570-71, 307 N.W.2d 881, 895 (1981).

Chief Justice Heffernan found support for the supreme court's unwillingness to act in such a sensitive area from Justice Frankfurter:

Courts are not equipped to pursue the paths for discovering wise policy. A court is confined within the bounds of a particular record, and it cannot even shape the record. Only fragments of a social problem are seen through the narrow windows of a litigation. Had we innate or acquired understanding of a social problem in its entirety, we would not have at our disposal adequate means for constructive solution. The answer to so tangled a problem . . . is not to be achieved by . . . judicial resources . . . .

*Id.* at 571, 307 N.W.2d at 895-96 (quoted source omitted). The court also found reassurance in the words of Benjamin Cardozo who was considered a judicial activist and who believed that courts should blaze trails where necessary to protect human rights:

The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains. [Citations omitted.]

*Id.* at 571, 307 N.W.2d at 896 (quoted source omitted).

In a comparable situation, the Court of Appeals of Arizona affirmed the order of a trial court dismissing criminal prosecution against a woman for child abuse based on her use of heroin during pregnancy. The Arizona court believed that it was better to defer to the legislature:

[A]s many of the policy arguments advanced by petitioner and respondent demonstrate, the legislature is in a better position than this court to determine whether a woman's prenatal conduct is more appropriately addressed through education, medical and rehabilitative treatment, social welfare, criminal statutes, or some combination of these approaches.

[T]he legislature is composed of regularly elected members, subject to the electoral will of the population of their respective districts, and thus the legislature is more attuned to the will of the public on public policy than are the courts. . . . [T]he legislature conducts public hearings in a nonadversarial manner, and is more able to explore all prospective aspects of a situation that may factually occur when it creates a crime. This court, however, is limited to

ruling solely on the specific issue in the single case before it, and we base our decision on the facts as developed by adversarial parties as applied only to the limited issues preserved for review. [Alteration in original; citations omitted].

*Reinesto v. Superior Court*, 894 P.2d 733, 737-38 (Ariz. Ct. App. 1995).

From the beginning this case was been well-prepared, skillfully presented and carefully considered; however, much is missing from the record. We do not have the benefit of evidence or arguments from numerous groups representing medicine, medical ethics, psychology, psychiatry, sociology and medicolegal ethics. I would expect that these groups would provide meaningful input on the questions of whether the State should intervene in the area of the maternal-fetal relationship; the prevalence of maternal deficiencies during pregnancy; the effects on the fetus of a mother disregarding medical advice; the effects on the physician-patient relationship; the potential for creating a maternal-fetal adversarial relationship; whether intervention will improve or worsen prenatal care; and, a host of other problems. Even if we were to take judicial notice of the treatises in these areas, we still would know very little of the short-term and long-term impact of our decision on society as a whole and on childbearing women specifically. As this court and the juvenile court are dependent upon the opinions of expert witnesses, it appears to me that our exercise of judicial discretion in this case is "unguided by well thought-out policy determinations reflecting the interest of society," as well as of the mother and the fetus. *Eberhardy*, 102 Wis. 2d at 569, 307 N.W.2d at 895.[7]

_____

[7] The American Medical Association Board of Trustees finds that courts are not the proper forum to resolve maternal-

Exigent circumstances do not justify disregarding the ramifications of extending the jurisdiction of the juvenile court to a fetus in utero. Exigent circumstances do not justify disregarding the role of the legislature and the careful study and deliberate debate this issue requires. In this case, Angela M.W. is reported to be more than thirty-six weeks pregnant; there is evidence that the fetus is exposed to the greatest risk of harm in the first trimester when the fetus is the most sensitive to "adverse maternal behavior like cigarette smoking, occasional use of alcohol, and environmental pollution." Nocon, 5 J. L. & HEALTH at 20.[8] It

fetal conflicts. "[C]ourts are ill-equipped to resolve conflicts concerning obstetrical interventions. The judicial system ordinarily requires that court decisions be based on careful, focused deliberation and the cautious consideration of all facts and related legal concerns." *Legal Interventions During Pregnancy: Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women* (AMA Board of Trustees Report), 264 JAMA 2663, 2665 (1990) [hereinafter AMA Board of Trustees]. The AMA Board of Trustees suggests that judges will not be familiar with the policy concerns and the immediate deadlines and intense pressures of a request for intervention will likely result in hasty decisions. *Id.*

The report of the AMA Board of Trustees includes thoughtful discussions on intervention when a pregnant woman refuses medical treatment and intervention in response to harmful behavior by a pregnant woman. I find the report to be comprehensive and well-reasoned. I am satisfied that the AMA Board of Trustees' concerns and recommendations apply equally to both issues. The legal ramifications of the concerns of the AMA Board of Trustees are discussed in Nelson II, 259 JAMA 1060.

[8] The AMA believes that the detention of pregnant women will be of limited value "since a considerable amount of damage could be done to the fetus before a woman even realized she was pregnant." AMA Board of Trustees, 264 JAMA at 2667.

is conceivable that any damage to the fetus has already occurred and Angela M.W.'s detention is of no medical usefulness.

## IV.

I do not believe that I have used hyperbole in Part II of this dissent by partially cataloging the ramifications of intervention in the maternal-fetal conflict. Other courts and the American Medical Association (AMA) have extensively discussed the negative consequences of intervention in response to the harmful behavior by a pregnant woman.

The Illinois Supreme Court explored the repercussions of recognizing a tort cause of action, by a newborn, against a mother for injuries suffered in the womb.

> It is clear that the recognition of a legal right to begin life with a sound mind and body on the part of a fetus which is assertable after birth against its mother would have serious ramifications for all women and their families, and for the way in which society views women and women's reproductive abilities. The recognition of such a right by a fetus would necessitate the recognition of a legal duty on the part of the woman who is the mother; a legal duty, as opposed to a moral duty, to effectuate the best prenatal environment possible. The recognition of such a legal duty would create a new tort: a cause of action assertable by a fetus, subsequently born alive, against its mother for the unintentional infliction of prenatal injuries.
>
> It is the firmly held belief of some that a woman should subordinate her right to control her life when she decides to become pregnant or does become pregnant: anything which might possibly harm the developing fetus should be prohibited and

all things which might positively affect the developing fetus should be mandated under penalty of law, be it criminal or civil. Since anything which a pregnant woman does or does not do may have an impact, either positive or negative, on her developing fetus, any act or omission on her part could render her liable to her subsequently born child. While such a view is consistent with the recognition of a fetus' having rights which are superior to those of its mother, such is not and cannot be the law of this State.

A legal right of a fetus to begin life with a sound mind and body assertable against a mother would make a pregnant woman the guarantor of the mind and body of her child at birth. A legal duty to guarantee the mental and physical health of another has never before been recognized in law. Any action which negatively impacted on fetal development would be a breach of the pregnant woman's duty to her developing fetus. Mother and child would be legal adversaries from the moment of conception until birth.

*Stallman v. Youngquist,* 531 N.E.2d 355, 359 (Ill. 1988).

Although the Illinois Supreme Court is speaking in terms of duty and breach of duty, its conclusions are equally applicable to a CHIPS proceeding under the juvenile code. In this case, the fetus is alleged to be abused or neglected because Angela M.W. "neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the [fetus]." Section 48.13(10), STATS. This statutory language is nothing more than a codification of the basic duties a parent has to a child. It does not matter whether there is a tort action for injuries

587

suffered in the womb or a juvenile court action alleging a fetus is the subject of abuse or neglect; judicial intervention will create an adversarial relationship between the mother and the fetus, and after birth, there will be an adversarial relationship between the mother and the newborn.

This adversarial relationship is of concern to the AMA Board of Trustees which points out that state intervention will "emphasize conflict between the pregnant woman and her fetus, which does not encourage a healthy relationship between the pregnant woman and her future child." *Legal Interventions During Pregnancy: Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women* (AMA Board of Trustees Report), 264 JAMA 2663, 2669 (1990) [hereinafter AMA Board of Trustees]. The AMA believes that prenatal education and treatment along with an emphasis on voluntary cooperation between a woman and her physician will facilitate a more emotionally positive relationship between the mother and the newborn. *Id.*

The AMA Board of Trustees expresses concern that state intervention will create a counterproductive adversarial relationship between the woman and her physician. It is concerned that intervention will precipitate a general distrust of physicians if it becomes known that a particular physician or physicians are willing to override the pregnant woman's expectation of confidentiality. It theorizes that it is reasonable to assume that intervention will deter pregnant women from seeking contact with those persons who might initiate intervention.[9] *Id.* at 2667. The AMA Board of

---

[9] In this case, Angela M.W.'s physician diagnosed her use of cocaine as child abuse and he reported his diagnosis to the State as required by § 48.981(2), STATS.

Trustees fears that the potential consequences of intervention will discourage a woman from seeking prenatal care or dissuade her from providing accurate information to her physician for fear of self-incrimination. "This failure to seek proper care or to withhold vital information concerning her health could increase the risks to herself and her baby." *Id.* at 2669 (quoted source omitted).

In its report the AMA relates that intervention will impact unfairly on pregnant women from minorities and lower socioeconomic positions.[10] *Id.* at 2665. "A woman's socioeconomic position may further affect her ability to carry out her moral responsibility to provide reasonable care in preserving fetal health. The women most likely to be prosecuted for exposing their fetuses to harmful substances are those from lower economic levels." *Id.* at 2668.[11]

The AMA Board of Trustees' report discusses the distinction between moral and legal responsibilities and the unknown problems and burdens that could be

---

[10] The AMA summarizes the initial findings of one study that in 81% of the instances in which a court-ordered intervention was sought, the woman was from a minority. AMA Board of Trustees, 264 JAMA at 2665.

[11] According to the AMA, the intervention will overlook the other severe life stresses that may contribute to a pregnant woman's substance abuse. Compared to nonabusers, female substance abusers have more dysfunction in their families, suffer from higher levels of depression, anxiety, sense of powerlessness, and have low levels of self-esteem and self-confidence. Seventy percent were sexually abused as children; 83% had chemically dependent parents; 70% reported being beaten and 10% were homeless. AMA Board of Trustees, 264 JAMA at 2668. Intervention will ignore these stresses in favor of the fetus; intervention will treat the fetus and not the mother; intervention will not improve the mother's parenting skills.

created by legally enforcing a moral responsibility.[12] The report explains the implications for intervention on the physician's ethical obligations.[13] The AMA is worried because there is no mechanism to prevent inconsistent applications for intervention. According to the report, intervention in maternal-fetal conflict will create impermissible legal obligations for the physicians.[14] The AMA also theorizes that intervention will

[12] For example, in *Lausier v. Pescinski*, 67 Wis. 2d 4, 226 N.W.2d 180 (1975), the Wisconsin Supreme Court held that there was no authority for a court to legally enforce the moral duty of aiding a sibling by the donation of a kidney.

[13] Another commentator has also discussed the ethical dilemma for physicians,

> [T]he obstetrician is the mother's advocate. Clearly, all legal and ethical duties flow to the mother, and it is critical to focus upon the physician-patient relationship when controversy occurs. Decisions by physicians that force their patients into undesired treatment breach their fiduciary duties, especially those to prevent injustice. In addition, compelled medical care also violates traditional norms of ethics and law. Nevertheless, the physician may be a fetal advocate, especially since there is an ethical obligation to promote fetal health. However, fetal advocacy does not mean that the state can coerce a doctor under penalty to follow this obligation as if it were a legal duty. Although it is correctly assumed that a well informed woman will desire to protect the fetus, this does not mature into an inherent fetal "right" to such protection. This is because the pregnant woman, like any other adult, has the essential right to accept or reject medical recommendations based on their personal priorities and values.

Nocon, 5 J. L. & HEALTH at 19.

[14] "A physician's role is as a medical adviser and counselor. Physicians should not be responsible for policing the decisions that a pregnant woman makes that affect the health of herself and her fetus, nor should they be liable for respecting an informed, competent refusal of medical care." AMA Board of Trustees, 264 JAMA at 2666.

have a negative impact on "informed consent." *Id.* at 2665.

Nelson, an attorney and lecturer in medical ethics, has identified the potential impact of intervention:

> A policy that would permit the courts or the police to intervene in the activities of pregnant women that arguably place their fetuses at some risk of harm must be considered in light of its potential effectiveness and what its enforcement would require. Every action a pregnant woman takes has a potential impact on her fetus, including the simplest and most common activities of daily living: eating, drinking, sexual intercourse, and physical activity . . . .. In addition, women may expose their fetuses to potential harm when they work, due to occupational hazards. Consequently, an effective public policy designed to prevent fetal harm would require extensive monitoring of and possible interference with each of these activities. This would entail an unprecedented social intrusion into the homes and private lives of pregnant women and their families.
>
> The only plausible justification for a policy with such tremendous impact on the lives and civil liberties of pregnant women would be overwhelming need. However, it is far from clear that such need exists. Common clinical experience shows that it is an unusual woman who does not do everything within reason for the best interests of her fetus. In fact, clinicians are often impressed with the medical risks and life-style restrictions voluntarily assumed by pregnant women to ensure a good outcome of their pregnancies. In short, situations in which fetuses may die or be born damaged as a direct result of maternal behavior are likely to be rare. *This being so, the price of intervention to women's*

> *liberty and privacy seems too high.* [Emphasis added.]

Nelson II, 259 JAMA at 1065.

The AMA discusses several legal considerations. First, it rejects the adoption of any legal duty on the part of a pregnant woman, who forgoes her right to terminate the pregnancy, to bring the child into the world as healthy as is reasonably possible. It rejects this duty because it would include restrictions that may significantly limit a woman's freedom of action. Second, it declines to accept any policy that implies that once a pregnant woman who does not take affirmative steps to end the pregnancy forfeits her constitutional rights to bodily integrity and privacy.[15] The AMA argues that such a policy—pregnancy is an automatic waiver of constitutional rights—is a state-created penalty for choosing to bear a child. Finally, the AMA points out that the right to procreate is constitutionally protected and cannot be penalized by the state.[16] AMA Board of Trustees, 264 JAMA at 2669.

---

[15] One author concludes that a pregnant woman who decides to carry her fetus to term has not waived her right to conduct the labor and delivery in a manner she desires. Nocon, 5 J. L. & HEALTH at 20.

[16] The report of the AMA Board of Trustees contains the following observation,

> [L]egally enforcing a pregnant woman's moral obligation to the fetus creates a burden or penalty on pregnancy itself. The right to bear a child is constitutionally protected. Forcing a pregnant woman to undertake a health risk or to accept an invasive procedure against her will burdens her decision to have a child.

AMA Board of Trustees, 264 JAMA at 2664.

## V.

The purpose of the discussion of the potential problems with state intervention in the harmful behavior of pregnant women was to focus on issues which cannot be adequately raised, studied, debated and decided in the adversarial arena. The issue is too complex for the courts because it extends beyond the parties in this action. The decision to extend juvenile court jurisdiction to the fetus in utero must be made in the legislature because:

> [t]he philosophical question confronting society is whether it wishes to enforce a policy that would entail on an unprecedented scale serious invasions of a woman's privacy, restriction of her civil liberties, and interference with her religious and personal beliefs. In a secular society such as ours that embraces no particular moral point of view and that attempts to encompass groups with widely divergent views on how persons should live their own lives, individuals are required to forgo "the temptation to impose by state force (their) own view of proper private morality."

Nelson II, 259 JAMA at 1065.

For these reasons, I respectfully dissent.