Linda M. TURNER, Plaintiff-Appellant,

v.

CITY OF MILWAUKEE, Defendant-Respondent.†

Court of Appeals

*No. 94–1461. Submitted on briefs February 7, 1995.—Decided April 11, 1995.*

(Also reported in 535 N.W.2d 15.)

†Petition to review filed.

413

For the plaintiff-appellant the cause was submitted on the briefs of *Gray & End*, with *J. Michael End* of Milwaukee.

For the defendant-respondent the cause was submitted on the briefs of *Grant F. Langley*, city attorney, and *John J. Heinen*, assistant city attorney of Milwaukee.

Before Sullivan, Fine and Schudson, JJ.

SCHUDSON, J.   Linda M. Turner appeals from the judgment dismissing her action against the City of Milwaukee for injuries she suffered from a dog bite. The trial court concluded that the City was immune from liability. We conclude that the City was not immune in this case because its failure to seek a court order to remove or destroy the dog violated its ministerial duty under a city ordinance requiring the City to seek such an order. Accordingly, we reverse.

This case was tried to the court on stipulated facts. On October 3, 1990, Turner was bitten on both her legs and thighs by Dusty, a german shepherd owned by Mary R. Collins. Within the approximate three years preceding that attack, Dusty had attacked at least twelve other people, including several children who suffered serious injuries. In response to some of these attacks, the City issued numerous citations to Collins for not having a dog license, for having a dog at large, and for harboring a vicious animal. The City also quarantined Dusty on several occasions and urged Collins to get rid of or control her dog. Finally, after Dusty's fourteenth attack injured an eleven-year-old boy, the City Commissioner of Health wrote to the City Attorney requesting that he obtain a court order to destroy the dog. One month later, the circuit court granted the request and Dusty was destroyed.

Turner argues that because of Dusty's vicious history, the City was required to seek a court order for the

dog's removal or destruction long before she was attacked. She maintains that the City had a ministerial duty to do so under City of Milwaukee Ordinance 78-11(5) that, in relevant part, provided:

**78-11. Harboring Vicious Animals. 1.** No person may harbor or keep a vicious animal within the city. An animal is deemed to be vicious if it has attacked or injured or bitten any person or household pet, or when a propensity to attack or bite any person or other animal exists and is known or ought reasonably to be known to the person harboring such animal.

**2.** The biting or injury of a person by an animal shall in the absence of contrary evidence be presumed to be due to an unprovoked attack. . . .

**3.** Any animal which is found off of the premises of its owner may be seized by any police officer, animal control officer or humane officer and upon establishment to the satisfaction of any court of competent jurisdiction of the vicious character of the animal, it may be killed by a police officer or humane officer. . . .

**4.** Any person who owns or harbors a vicious animal may by decision of a court of competent jurisdiction be required to have the animal destroyed. Failure of the owner or person in charge to comply with such requirement shall constitute a separate offense.

**5.** A vicious animal that has been involved in 2 or more previous unprovoked attacks, injuries or bites *shall* be removed from the city or destroyed as a

result of judgment rendered by a court of competent jurisdiction.[1]

(Emphasis added.) The City points out, however, that § 174.02(3), STATS., provided:

> **(3)** COURT ORDER TO KILL A DOG. (a) The state or any municipality *may* commence a civil action to obtain a judgment from a court ordering an officer to kill a dog. The court may grant the judgment if the court finds both of the following:
> 1.  The dog caused serious injury to a person or livestock on 2 separate occasions off the owner's property, without reasonable cause.
> 2.  The owner of the dog was notified or knew prior to the 2nd injury, that the dog caused the first injury.[2]

(Emphasis added.) Thus, while Turner relies on the *ordinance* and what she considers to be its requirement that the City "shall" seek a court order for a dog's removal or destruction, the City counters that the *statute* says only that it "may" seek such an order.[3]

---

[1] We quote City of Milwaukee Ordinance 78-11(5) as it existed at the time Dusty bit Turner and as it existed as of the filing of her complaint against the City. Effective January 12, 1993, this section was amended to state: "A vicious animal that has been involved in 2 or more previous unprovoked attacks, injuries or bites *may* be destroyed as a result of judgment rendered by a court of competent jurisdiction, as specified under s. 174.02(3), Wis. Stats." (Emphasis added.) This section was again modified, effective March 25, 1994, to delete the phrase referring to § 174.02(3), STATS.

[2] Section 174.02(3), STATS., was amended March 17, 1994, to replace the word "livestock" with "domestic animal." 1993 WIS. ACT 154, sec. 4. This change does not affect our analysis.

[3] The City further argues that Milwaukee Ordinance 78-11 (5) applies to duties imposed on those who own or harbor vicious

The trial court concluded that the city ordinance did not impose a ministerial duty to seek destruction of the dog, that the City's responses to the attacks were purely discretionary, and that the circumstances did not bring this case within the "known present danger" exception to governmental immunity. Turner offers persuasive arguments challenging all three conclusions.

animals, not to duties of the City Attorney or health department. The City further maintains that Milwaukee Ordinance 78-11.5(11), however, governs the City's obligations. It states:

> 11. DESTRUCTION. a. Any dog that has caused serious injury to a person or persons on 2 separate occasions off the owner's premises, without reasonable cause, may be destroyed as a result of judgment rendered by a court of competent jurisdiction, as specified under s. 174.02(3), Wis. Stats.
> b. The city attorney, at the request of the commissioner of health or the police department may petition a court of competent jurisdiction to obtain a court order to destroy a dog where the court finds any of the following:
> b-1. The dog caused great bodily harm to a person.
> b-2. The dog has been designated as vicious by the health department pursuant to sub. 7 and the owner or caretaker of the dog has failed to comply with the provisions specified in subs. 3, 4 and 8 and more than 30 days has elapsed from the date that the owner or caretaker was served with notice that the dog has been declared vicious.

Turner offers no argument based on Milwaukee Ordinance 78-11.5(11). Thus, in effect, she contends that regardless of any discretion the City may possess under other ordinances, Milwaukee Ordinance 78-11(5) mandated the City's action to seek a vicious dog's removal or destruction. We agree. The City provides no authority to support its narrow interpretation of Milwaukee Ordinance 78-11(5) or its suggestion that, somehow, the mandate of Milwaukee Ordinance 78-11(5) is trumped by the language of Milwaukee Ordinance 78-11.5(11).

Application of a statute to specific facts is subject to our *de novo* review. *State v. Vennemann*, 180 Wis. 2d 81, 93, 508 N.W.2d 404, 409 (1993). The principal purpose of our review is to determine the intent of the legislative body by first analyzing the plain meaning of the law. *Id.* This court may not resort to statutory construction if the statute is clear on its face. *See Berna-Mork v. Jones*, 174 Wis. 2d 645, 650-651, 498 N.W.2d 221, 223 (1993). If, however, a statute "is ambiguous, that is, if 'reasonably well-informed persons could understand it in more than one way,' the rules of statutory construction 'require us to look at the statutory context, subject matter, scope, history and object to be accomplished.' " *Continental Casualty Co. v. Milwaukee Metro. Sewerage Dist.*, 175 Wis. 2d 527, 531, 499 N.W.2d 282, 283 (Ct. App. 1993) (citation omitted). "[A]mbiguity can be created by the interaction of two separate statutes." *State v. Anderson*, 160 Wis. 2d 435, 439, 466 N.W.2d 681, 682 (Ct. App. 1991). Where statutes on the same subject conflict or are inconsistent, this court must make every effort to harmonize them in order to give effect to the purpose of each statute. *Rossie v. DOR*, 133 Wis. 2d 341, 351, 395 N.W.2d 801, 806 (Ct. App. 1986). "Courts must look to the common sense meaning of a statute to avoid unreasonable and absurd results." *NCR Corp. v. DOR*, 128 Wis. 2d 442, 456, 384 N.W.2d 355, 362 (Ct. App. 1986).

We conclude that, particularly in light of the context, subject matter, and obvious object to be accomplished, Milwaukee Ordinance 78-11(5), read in harmony with § 174.02(3), STATS., mandates the City's ministerial duty to seek a court order for removal or destruction of "[a] vicious animal that has been

involved in 2 or more previous unprovoked attacks, injuries or bites." As Turner correctly argues, "The intent of the ordinance is not to allow a vicious animal to remain on the City streets . . . . Any other interpretation would nullify the obvious intent of the Common Counsel by choosing the word 'shall' in the ordinance."

Dusty was a dog that had been involved in two or more unprovoked attacks. Thus, under Milwaukee Ordinance 78-11(5), Dusty was a dog that "shall" be moved from the city or destroyed by court order. As we have explained:

> "Use of the word 'shall' creates a presumption that the statute is mandatory. The presumption is strengthened where the legislature uses 'may' in the same or related statutory sections. Such use demonstrates recognition of the differences in the meanings of the two words and implies purposeful use of each."

*In re F.T.*, 150 Wis. 2d 216, 224, 441 N.W.2d 322, 325 (Ct. App. 1989) (citations omitted). The mandate of the ordinance is clear and its purpose to protect against vicious dogs is apparent. Thus, in harmonious interaction with this mandate, the statutory reference to "may" is not a grant of discretion to the City *not* to act, but rather, an allowance that the City, as well as the State, has authority to seek the court order. Indeed, without that statutory component, the ordinance could never bring about a dog's destruction—one of its two stated means to address the dangers of vicious animals. Construing one statute to void others would make no sense and would lead to unreasonable and absurd results. Thus, in relation to the clear mandate of this ordinance, the only reasonable reading of "may"

in the statute is that either the State or the City would be *allowed* to commence the action. To read "may" as permitting the City to ignore or avoid the mandate of its own ordinance would be absurd.

The City maintains, however, that by issuing citations to the dog owner, it did not avoid its obligation to act and, further, that its actions were within a discretionary range covered by immunity. We disagree.

Section 893.80(4), STATS., provides immunity to the City against any suit "for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Such acts are, by definition, non-ministerial, and the terms "quasi-judicial," "quasi-legislative," and "discretionary" are synonymous. *Lifer v. Raymond*, 80 Wis. 2d 503, 512, 259 N.W.2d 537, 541-542 (1977). This general rule of immunity, however, is subject to exceptions in order to set a steady balance between the need for public officials to freely perform their functions and the right of aggrieved parties to seek redress. *C.L. v. Olson*, 143 Wis. 2d 701, 710, 422 N.W.2d 614, 617 (1988). Thus, immunity affords no protection for what an official claims to be a discretionary act when, in fact, the official was required to perform what was really a ministerial duty. *See id.* at 710-711, 422 N.W.2d at 617. As we recently explained:

> A duty can be ministerial because it is "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." A ministerial duty can also arise under circumstances where "the nature of the danger is compelling and known to the

officer and is of such force that the public officer has no discretion not to act."

*Barillari v. City of Milwaukee*, 186 Wis. 2d 415, 421, 521 N.W.2d 144, 146 (Ct. App. 1994; *petition for review granted*, Oct. 24, 1995) (citations omitted).

In this case, both circumstances apply. In the first place, as we have just concluded, the City's duty to seek a court order for removal or destruction was "absolute, certain and imperative" once Dusty's status as a vicious animal was established by a second unprovoked attack. *See id.* In the second place, after the dog's numerous attacks, "the nature of the danger [was] compelling and known" such that the City had "no discretion not to act." *See id.* Indeed, the compelling and known nature of these repeated attacks rendered the danger "of such force" that it matched or exceeded the known dangers in cases where the known danger exception to immunity has been applied. *See Cords v. Anderson*, 80 Wis. 2d 525, 541-542, 259 N.W.2d 672, 679-680 (1977) (immunity unavailable to state park manager where manager failed to either notify superiors of hazardous trail condition or erect warning signs); *Domino v. Walworth County*, 118 Wis. 2d 488, 490-493, 347 N.W.2d 917, 918-920 (Ct. App. 1984) (immunity unavailable to sheriff's department dispatcher who dispatched squad to downed tree across a road, and then diverted squad elsewhere without reassigning anyone to the fallen tree hazard).

The City knew of the extreme danger Dusty posed. Gregory McGee, a City Health Department official who investigated some of the attacks, told of his awareness of Dusty's repeated attacks in deposition testimony included in the stipulated submissions to the trial court. In one of his incident reports he specifically referred to the fact that Dusty, at a young age, had

bitten people four times within a period of nine months. Explaining that he wanted his report to convey the severity of Dusty's behavior, McGee said that the frequency of attacks indicated that Dusty was likely "to be more vicious than the average biting animal, a year or two later, and even more so a few years later." Following the eighth reported attack, McGee viewed Dusty not as "a protective animal, but an attack animal."

Children and neighbors were not the only ones in danger. Milwaukee Police Officer Mark A. Koch described Dusty's twelfth reported attack when he was investigating a call at the Collins home:

> The dog came charging down the steps. I could hear him coming down the steps. I grabbed the person I had in custody and as I was wheeling him around, the dog came charging at me, went around in a circle about three or four times. There was broken glass in the yard, I tripped and fell on the glass, I slipped on it.
>
> As I was going down, the dog grabbed onto my armpit and . . . the shoulder area . . . . As I am trying to pull away from the dog, the dog kept on trying to pull me down to the ground. Well, he finally won, because I figured this was a losing battle. Why have him rip my arm? I will give him my arm.
>
> I couldn't shoot the dog. I had the gun in my own hand and I had the kid in the other hand. I was afraid if I shot the dog, the kid would get in the way or I would miss and the bullet would ricochet and hit my partner in the yard, the kid or myself, so, I wasn't about to risk that.
>
> Finally, I let the kid go and he pulled the dog off me. I looked and on my uniform the shirt was torn and I could see that I was bleeding quite heavily. They took me to the hospital and I had damage to the

shoulder and to the underneath, my armpit. I have still two scars there today. The doctor even said there would be permanent scar there.

As a result of this twelfth attack, Officer Koch missed approximately two weeks of work and Collins received more citations. Dusty, however, continued to live with her and, the next month, Dusty attacked Turner, who ultimately required two surgeries for the injuries she suffered. Even then, Dusty's dangers remained unchecked.

Although there was no doubt about Dusty's extreme danger, there was apparent doubt about whether the owner or the City should deal with it. McGee stated:

> I felt that the dog was a threat to society, and I always believe that it is best if the citizen takes care of actions rather than having the system do it for them.
>
> . . . .
>
> I did not believe it would have been okay to move that dog to another residence whether it be a farm or the middle of Canada. I did believe that this dog Dusty needed to bite the dust, put to sleep.

McGee, however, felt frustrated in what he perceived as his inability to accomplish that. He stated that he felt "anger and exasperation." McGee further stated that he "was trying to inform the powers that be that something needs to be done," and that he "was powerless in preventing this animal from biting again." He seemed similarly frustrated in his efforts to get Collins to control her dog, noting on an incident report following the eighth attack that she "refuses to license now for 2 years even though cited by police and health department."

According to the stipulated facts, Gregory J. Jach, the City's Nuisance Control Manager, did not understand the City's authority to seek a circuit court order for the dog's removal or destruction. In his deposition he testified that he first learned of that authority as a result of this case. Carey D. Meier, enforcement manager for the City's Bureau of Consumer Protection and Environmental Health, testified that when he met with Jach to discuss having Dusty destroyed, Jach told him that the City could not do that; "that all the City ordinances could do was go through municipal court and we could not go through the State Statute, because we had to go over to the State Building to the District Attorney to take it to that avenue and we couldn't do that."

The City argues that application of the "known present danger" exception and the reasoning of *Cords* and *Domino* to this case would represent an unprecedented extension of the exception to governmental actions in the enforcement of police powers. The City contends, "[t]o do so would effectively deprive the government of its ability to set priorities in accordance with available resources." We disagree. The Common Council set the priorities. The Common Council concluded that safety required removal or destruction of vicious dogs. The Common Council did not provide any discretion to anyone to allow a vicious dog to continue living in the city and attacking its citizens. The City has offered no authority to suggest that the "known present danger" exception is inapplicable merely because the ministerial duty in this case encompassed the exercise of police powers. *See Barillari*, 186 Wis. 2d 415, 521 N.W.2d 144 (summary judgment based on immunity improperly granted to city where police detectives allegedly failed to fulfill their promise to protect woman and arrest man after he sexually

assaulted woman at knifepoint and threatened to return and kill her); *see also Losinski v. County of Trempealeau*, 946 F.2d 544, 554 (7th Cir. 1991) (immunity unavailable to deputy sheriff who assumed duty to protect woman who had temporary restraining order against her husband when deputy permitted woman to enter trailer alone with her husband, who then killed her).[4]

We conclude that the ordinance required the City to seek a court order for removal or destruction of the vicious dog, and that seeking the court order was a ministerial act by virtue of both the mandate in the ordinance and the present known danger presented by the dog. If immunity were to protect the City against liability where a vicious dog repeatedly attacks and where City officials do not even understand the law or how to enforce it, the Common Council's ordinances would be toothless and the City's citizens would be endangered. Accordingly, we reverse the trial court decision dismissing Turner's action and remand to the trial court for further proceedings consistent with this decision.[5]

---

[4] Resolving the case on these bases obviates the need to address Turner's additional argument that immunity should not be available to the City in this case because, even if the City had discretion to decide whether to seek a court order, the City failed to exercise any discretion. We do, however, note the irony in the City's argument that immunity should shield discretionary acts when its officials failed to seek removal or destruction because they did not understand their authority to seek a court order.

[5] We note that while the parties submitted the issue of liability to the trial court on stipulated facts, they reserved the

*By the Court.*—Judgment reversed and cause remanded.

issue of damages for subsequent trial, depending on the determination of liability.