THOMAS MORE HIGH SCHOOL, Petitioner-Appellant,†

v.

Elizabeth BURMASTER, State Superintendent, and
Wisconsin Department of Public Instruction,
Respondents-Respondents.

Court of Appeals

*No. 2004AP2511. Submitted on briefs May 5, 2005.
—Decided August 9, 2005.*

2005 WI App 204

(Also reported in 704 N.W.2d 349.)

† Petition to review denied 11-11-05.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Lawrence J. Haskin* of *Haskin & Book* of Oak Creek.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Robert M. Hunter*, assistant attorney general.

Before Fine, Curley and Kessler, JJ.

¶ 1. CURLEY, J. Thomas More High School (More) appeals from the trial court order affirming the decision of Elizabeth Burmaster, the State Superintendent of the Wisconsin Department of Public Instruction (DPI), who determined that More is not eligible to

participate in the Milwaukee Parental Choice Program (Choice), pursuant to WIS. STAT. § 119.23 (2003–04),[1] because the school is not located in the City of Milwaukee. On appeal, More contends that, under the plain language of § 119.23(2)(a), it is located in the City of Milwaukee, and that WIS. ADMIN. CODE § PI 35.03 does not apply to More because it is in conflict with § 119.23(2)(a) and exceeds the authority of the DPI. Because we conclude that § 119.23(2)(a) is not ambiguous, § PI 35.03 properly clarifies the private school requirements of the statute, including the requirement that to be eligible for Choice, a certificate of occupancy must be obtained from the City of Milwaukee, and Burmaster correctly determined that More is ineligible to participate in the program, we affirm.

## I. BACKGROUND.

¶ 2. The Milwaukee Parental Choice Program was created in 1989 to subsidize private education for underprivileged students in the City of Milwaukee.[2] More is a Catholic high school located primarily in the City of St. Francis. When it first sought participation in Choice in 1999, More was declared ineligible to participate because the school was not located in the City of Milwaukee.[3] While approximately 20% of the school grounds, comprised of green space, a parking lot, a

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] *See* WIS. STAT. § 119.23; WIS. ADMIN. CODE § PI 35.01. Section 119.23(2)(a) provides, in part: "[A]ny pupil in grades kindergarten to 12 who resides within the city [of Milwaukee] may attend, at no charge, any private school located in the city if all of the following apply[.]"

[3] John T. Benson was the State Superintendent when More was declared ineligible to participate in Choice the first time.

driveway, and track and field areas, are located in the City of Milwaukee, none of More's buildings are located in the City of Milwaukee.

¶ 3. In 2002, More attempted to have the portion of its property located in the City of St. Francis annexed to the City of Milwaukee. However, St. Francis voters defeated the referendum that would have allowed More to detach its land.[4]

¶ 4. Following the vote, More petitioned the DPI seeking a declaratory ruling that More was eligible to participate in Choice. While a decision was pending, the DPI's chief legal counsel wrote to More informing the school that in order to be eligible for Choice, it needed

---

Although the Dissent labels the most recent denial a "clearly political decision by Elizabeth Burmaster," it appears she was not the first State Superintendent to deny More participation in Choice because the school was not located in the City of Milwaukee. *See* Dissent, ¶ 23.

[4] Although we conclude that the statute is unambiguous, and thus have not and will not refer to extrinsic sources to discern its meaning, it is perhaps relevant to note, for background purposes only, that there have been unsuccessful executive and legislative attempts to amend the language of the statute. As Burmaster explained in the letter declaring More ineligible to participate:

> It is the department's opinion that in order for your school to be eligible for [Choice], the statutes governing the program would have to be modified. Former Governor McCallum did include such a provision in his proposed 2001–03 biennial budget bill; however, the provision was removed by the legislature (2001 Act 16). In addition, 2003 Assembly Bill 260 which would have allowed schools located in Milwaukee County to participate in [Choice] was recently vetoed by Governor Doyle.

As such, it appears as though attempts have been both advanced *and* defeated by both the executive *and* legislative branches.

to submit a timely application. More proceeded to submit an application for participation in Choice for the 2004–05 school year. After More submitted its application, the DPI sent a letter to More stating that rather than issue a declaratory ruling on More's eligibility, the school's eligibility would be determined based on More's submitted application. The next day, the DPI informed More that its application had been denied because the school was located in the City of St. Francis. In its reasoning, the letter noted that More could not obtain a certificate of occupancy from the City of Milwaukee as required by the administrative rule promulgated by the DPI to carry out WIS. STAT. § 119.23(2)(a)5.'s mandate. The letter explained:

> Wisconsin statutes governing the program provide that a private school in [Choice] must be located in the City of Milwaukee. In addition, the program's administrative rules require the administrator of each participating school to submit a copy of its current certificate of occupancy issued from the City of Milwaukee.[5] The map of the Thomas More property, obtained from the

---

[5] WISCONSIN STAT. § 119.23(2)(a) provides, in relevant part:

Subject to par. (b), any pupil in grades kindergarten to 12 who resides within the city may attend, at no charge, any private school located in the city if all of the following apply:

. . . .

5. The private school meets all health and safety laws or codes that apply to public schools.

WISCONSIN ADMIN. CODE § PI 35.03 provides, in relevant part:

(3) HEALTH AND SAFETY REQUIREMENTS. The administrator of a school in the Milwaukee parental choice program shall ensure that the school is meeting the requirements of s. 119.23 (2), Stats., regarding health and safety laws and codes for schools *by filing with the department a copy of the private school's current certificate of occupancy issued by the city of Milwaukee . . . . A private school*

City of Milwaukee, shows that over 80 percent of the property is located in the City of St. Francis, including all of the academic and administration facilities. Second, the St. Francis School District (covering the City of St. Francis) has historically listed Thomas More High School as a private school within its district boundaries and has offered federally funded services to the private school based on students attending Thomas More. Third, we have been advised by the City of Milwaukee, Milwaukee Development Center, that the City of Milwaukee does not have the authority to issue a certificate of occupancy for Thomas More because its school buildings are under the jurisdiction of the City of St. Francis. Finally, as you note in your affidavit in support of a Petition for a Declaratory Ruling, Thomas More petitioned St. Francis to detach the land occupied by Thomas More from St. Francis and petitioned Milwaukee to annex said lands into Milwaukee and the voters of St. Francis, by referendum, rejected the petition.

(Footnote added.)

¶ 5.  Thereafter, More filed a petition for judicial review of the DPI's ruling. The trial court affirmed the DPI's ruling, finding that More did not fulfill the occupancy permit requirement and was therefore ineligible to participate in Choice. More now appeals.

## II. ANALYSIS.

¶ 6.  On appeal, More contends that, under the plain language of WIS. STAT. § 119.23(2)(a), the school is located in the City of Milwaukee, and WIS. ADMIN. CODE § PI 35.03 does not apply to More because it is in

*that fails to meet the requirements of this subsection may not participate in the choice program.*

(Emphasis added.)

conflict with § 119.23(2)(a) and exceeds the authority of the DPI. Specifically, More insists that § 119.23(2)(a)

> is as important for what it does not say as what it does say. The statute does not say that a school must be located *entirely, wholly, completely,* or *exclusively* in the City of Milwaukee. That statute does not say that the school *building* or *buildings* must be located in Milwaukee.

(Emphasis in brief.) As such, More argues that "[t]he answer to this case is found in the very simple question: [I]s More located in the City of Milwaukee? The answer is yes." It asserts that because a school includes all of its property—including parking lots, driveways, athletic fields, fences and green space—and because a portion of More's parking lot, driveway, athletic fields, fences and green space is located in Milwaukee, then More is located in the City of Milwaukee. In the absence of more restrictive language, More argues, it must be concluded that the school is located in Milwaukee.

¶ 7. Moreover, More asserts that Wis. Admin. Code § PI 35.03 does not apply to More because it is in conflict with Wis. Stat. § 119.23(2)(a) and exceeds the authority of the DPI:

> Wis. Stat. § 119.23(2)(a) [ . . .] requires only that a private school be located in a first class city, not that the school be required to obtain an occupancy permit from Milwaukee. Therefore, there is a conflict between the statute and the administrative rule. Requiring a school to obtain an occupancy permit is clearly within DPI's authority since Wis. Stat. § 119.23(2)(a) 5 requires that a private school meet all health and safety laws or codes that apply to public schools. However, DPI cannot by administrative rule exclude from Choice those schools that the legislature has determined to be eligible for Choice. Resolving a conflict between a statute and an interpretive rule requires statutory interpretation.

. . . .

> Here, DPI, by promulgation of an administrative rule attempts to make the Choice law inapplicable to More because the City of Milwaukee will not issue it an occupancy permit. DPI has exceeded its authority in excluding More from participation in Choice . . . . [T]his court should rule that Wis. Admin. Code § PI 35.03 is inapplicable to More. More can insure that it meets the requirements of Wis. Stat[.] § 119.23 (2) (a) 5 regarding health and safety codes by filing with DPI an occupancy certificate from St. Francis.

(Citations omitted.) Furthermore, More contends that, in any event, § PI 35.03 should not control the outcome of this case because Choice first became law in 1989, and § PI 35.03 was not created until 2000, after More first sought participation in the program.[6]

¶ 8. The DPI contends that the

> terms of Wis. Stat. § 119.23(2)(a), as to what constitute[s] a school "located in the city," [are] ambiguous and that in conjunction with Wis. Stat. § 119.23(2)(a)5., the promulgation of Wis. Admin. Code § PI 35.03(3) (requiring schools participating in the Choice Program to obtain an occupancy permit from the City of Milwaukee) was necessary and appropriate and within the discretion granted to the State Superintendent by the Legislature.

It notes More's unsuccessful attempts to petition the City of St. Francis to detach the land upon which More's buildings are located so that it may be annexed by Milwaukee, and points to the veto of 2003 Assembly Bill

---

[6] Because this appeal does not concern the denial of More's first effort to participate in the Choice program and More has not cited to any legal authority in support of this specific argument, we will not consider it.

260, in support of its contention that both More and the legislature have recognized that the plain meaning of the statute leads to the inevitable conclusion that More is not eligible to participate in Choice. The DPI also insists that had the legislature intended for Choice to apply to schools "any part of whose grounds are located within the city," it could have inserted language indicating as much in the statute.

¶ 9. Further, the DPI asserts that Wis. Admin. Code § PI 35.03 does not conflict with the statute in that it is without question that "the city" referred to in Wis. Stat. § 119.23(2)(a) is the City of Milwaukee, § 119.23(2)(a)5. requires that the private school meet all health and safety law or codes that apply to public schools, and § 119.23(2)(a)5. "can reasonably be understood to require that the schools participating in the Choice Program demonstrate compliance (*i.e.,* obtain an occupancy permit) with all health and safety codes from 'the city' of Milwaukee."

¶ 10. In considering an appeal from an agency's decision, "we review the agency's decision, not the [trial] court's." *Kozich v. Employe Trust Funds Bd.*, 203 Wis. 2d 363, 368–69, 553 N.W.2d 830 (Ct. App. 1996). An agency's factual findings must be upheld "if there is credible and substantial evidence in the record upon which reasonable persons could rely to make the same findings." *ITW Deltar v. LIRC*, 226 Wis. 2d 11, 16, 593 N.W.2d 908 (Ct. App. 1999). "Once the facts are established, however, the application of those facts to the statute is a question of law." *Id.*

¶ 11. Moreover, "[s]tatutory interpretation is a question of law that we review de novo, and as such, we are not bound by an agency's interpretation." *Hutson v.*

*State of Wis. Pers. Comm'n*, 2003 WI 97, ¶ 31, 263 Wis. 2d 612, 665 N.W.2d 212. Yet, some degree of deference is generally given to an agency's statutory interpretation, but "[t]he degree of deference . . . depends upon the extent to which the 'administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute.' " *Id.* (citation omitted). The supreme court has identified three distinct levels of deference: great weight, due weight, and *de novo* review; "[w]hich level is appropriate 'depends on the comparative institutional capabilities and qualifications of the court and the administrative agency.' " *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996) (citation omitted).

¶ 12. The due weight standard "is appropriate when the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *Id.* at 286. If we employ the due weight standard, we will not overturn "a reasonable agency decision that comports with the purpose of the statute unless [we determine] that there is a more reasonable interpretation available." *Id.* at 287. Due weight deference "is not so much based upon [the agency's] knowledge or skill as it is on the fact that the legislature has charged the agency with the enforcement of the statute in question." *Id.* at 286. However, "[u]nder the due weight standard, 'a court need not defer to an agency's interpretation which, while reasonable, is not the interpretation which the court considers best and most reasonable.' " *Id.* (citation omitted). On the other hand, the *de novo* standard of review is "applicable when the issue before the agency is clearly one of first impression, or when an

agency's position on an issue has been so inconsistent so as to provide no real guidance[.]" *Id.* at 285 (citations omitted).

¶ 13.    The parties disagree as to which standard of review and level of deference is required here. The DPI asserts that we are faced with a mixed question of law and fact, in that the "essential question before the State Superintendent, and hence now before this Court, is whether More is 'located within the city [of Milwaukee],' as required by Wis. Stat. § 119.23(2)(a)[,]" and insists that "[t]hat determination clearly requires the application of the applicable statute to the State Superintendent's findings of fact in this case[,]" and that her findings must be upheld. Moreover, should we determine this to be purely a question of law, the DPI urges us to employ the due weight deference standard, as the "State Superintendent submits that she has 'some experience' in the area and, as the head of the agency charged by the Legislature with the enforcement of the statutes in question, her construction and application of Wis. Stat. § 119.23(2)(a) and (2)(a)5. are entitled to due deference[.]" On the other hand, More insists that there were no findings of fact in this case, and it involves only the application of a statute to an undisputed set of facts, which we should review *de novo,* as it is a case of first impression and "the Superintendent has no experience on this issue."

¶ 14.    As presented, this case essentially involves the interpretation of a statute, the determination of whether an administrative rule conflicts with a statute, and the application of a statute and an administrative rule to a set of facts. Though More argues that "the Superintendent has no experience on this issue," we conclude that the due weight standard is appropriate,

as the DPI has been charged with the enforcement and administration of Choice and the statute in question. *See, e.g.,* Wɪs. Sᴛᴀᴛ. § 119.23(11). While we agree with the DPI's ultimate conclusion, we determine that there is a more reasonable statutory interpretation available than that adopted by the DPI.[7]

■■■■

¶ 15.  "An administrative rule that conflicts with an unambiguous statute exceeds the authority of the agency that promulgated it[,]" *Seider v. O'Connell,* 2000 WI 76, ¶ 28, 236 Wis. 2d 211, 612 N.W.2d 659, and as such, we begin our review by considering whether Wɪs. Sᴛᴀᴛ. § 119.23(2)(a) is ambiguous, *see id.* The rules of statutory interpretation are as follows:

> When interpreting statutes, our goal is to give effect to the language of the statute. We begin by looking to the language of the statute because we "assume that the legislature's intent is expressed in the statutory language." Technical terms or legal terms of art appearing in the statute are given their accepted technical or legal definitions while nontechnical words and phrases are given their common, everyday meaning. Terms that are specifically defined in a statute are accorded the definition the legislature provided. In addition, we read the language of a specific statutory section in the context of the entire statute. Thus, we interpret a statute in light of its textually manifest scope, context, and purpose.

*Peterson v. Volkswagen of Am., Inc.,* 2005 WI 61, ¶ 19, 281 Wis. 2d 39, 697 N.W.2d 61 (citations omitted). Moreover, "extrinsic sources, such as legislative history, are not consulted unless the statute is ambiguous. A statute is ambiguous if it is susceptible to more than one reasonable understanding." *Id.* (citation omitted).

---

[7] Specifically, DPI concluded the statute was ambiguous, while we conclude it is not.

However, a statute is not ambiguous simply because the parties differ as to its meaning. *Seider*, 236 Wis. 2d 211, ¶ 30.

¶ 16.   WISCONSIN STAT. § 119.23(2)(a) is not ambiguous. The statute provides, in relevant part:

> **Milwaukee parental choice program.** . . . **(2)** (a) Subject to par. (b), any pupil in grades kindergarten to 12 who resides within the city may attend, at no charge, any private school located in the city if all of the following apply:
>
> . . . .
>
> 5. The private school meets all health and safety laws or codes that apply to public schools.

Section 119.23(2)(a)5. A plain reading of the statute succinctly indicates that any pupil within a certain geographic region may attend any "private school located in the city" if, among other things, the private school meets all health and safety laws or codes that apply to public schools. The title of the statute is "Milwaukee parental choice program." Clearly, then, from the language and context of the statute, "the city" referred to is Milwaukee. It is also quite clear from the language of the statute that the "school" must be located in the City of Milwaukee. "School" is not defined by the statute, but in a common, everyday sense, the word "school" generally refers to the building or buildings within which the educational institution is operated. The private school itself must be located in the City of Milwaukee.

¶ 17.   Indeed, there is no other plausible interpretation when one reads the entire statute in context. For example, WIS. STAT. § 119.23(7)(d) states, in relevant part:

> By August 1 before the first school term of participation in the program . . . each private school participating in the program under this section shall submit to the department all of the following:
>
> 1. A copy of the school's current certificate of occupancy issued by the city . . . .

Just as "the city" in the previous section clearly refers to the City of Milwaukee, so too does "the city" refer to the City of Milwaukee here. Had the legislature intended for schools whose buildings are not physically located in the City of Milwaukee to participate in the program, surely it would not require them to submit "[a] copy of the school's current certificate of occupancy issued by *the city*[,]" for it would be impossible to do so (emphasis added).[8]

¶ 18. Moreover, WIS. STAT. § 119.23(6) requires "[t]he board" to "provide transportation to pupils attending a private school under this section . . . ." Within a

---

[8] The Dissent questions this "impossibility" and suggests that the City of Milwaukee could, or perhaps should, "issue a 'certificate of occupancy,' or join in a certificate of occupancy with overlapping jurisdiction, for a facility that straddles Milwaukee and another community[.]" Dissent, ¶ 26. Here, however, the occupied facilities are not straddling the line—they are located in the City of St. Francis, and an answer to the question of what would or should happen if the school buildings were located in both cities is better left to be determined by a case with that factual scenario. Without any information regarding whether such a scenario even exists in the City of Milwaukee, it is perhaps a futile exercise to predict what should happen in such a case, especially in light of the distinct and likely possibility that the legislature had far more information before it in drafting and enacting the statute than we do now, and potentially considered that scenario and/or was mindful of its potential during the enactment of the statute. Moreover, following the Dissent's logic, any school, anywhere, can become a Choice school by buying a small plot in the City of Milwaukee.

statute entitled "Milwaukee parental choice program," "the board" clearly refers to the Milwaukee Board of School Directors. As the Milwaukee Board of School Directors oversees only the school districts within the City of Milwaukee, a private school eligible for participation in Choice would presumably have to fall within the geographic boundaries of a district under the governance of the Milwaukee Board of School Directors. This clearly supports the plain and unambiguous intent of the statute—the private school itself must be located in the City of Milwaukee.

¶ 19. As such, a plain reading of the statute applied to the facts here indicates that, although portions of More's property are located in Milwaukee, the school itself is not. Although More argues that the language of the statute does not require that the school "must be located *entirely, wholly, completely,* or *exclusively* in the City of Milwaukee*" or that "the school *building* or *buildings* must be located in Milwaukee," a plain reading of Wis. Stat. § 119.23(2), when read in the context of the entire statute, supports the opposite interpretation. Accordingly, we determine that the statute is unambiguous in that regard.

■■■■

¶ 20. Finally, the statute broadly requires the private school to meet "all health and safety laws or codes that apply to public schools." Wis. Stat. § 119.23(2)(a)5. To clarify what is required, Wis. Admin. Rule § PI 35.03(3), was promulgated using language almost identical to that found in Wis. Stat. § 119.23(7)(d)'s mandate requiring a certificate of occupancy from the City of Milwaukee:[9]

---

[9] The DPI asserts that the administrative rule was promulgated to clarify the phrases "located in the city" and "meets all health and safety laws or codes."

**(3)** HEALTH AND SAFETY REQUIREMENTS. The administrator of a school in the Milwaukee parental choice program shall ensure that the school is meeting the requirements of s. 119.23 (2), Stats., regarding health and safety laws and codes for schools *by filing with the department a copy of the private school's current certificate of occupancy issued by the city of Milwaukee . . . . A private school that fails to meet the requirements of this subsection may not participate in the choice program.*

(Emphasis added.) *See* WIS. STAT. § 119.23(11) ("The department shall promulgate rules to implement and administer this section."). More erroneously argues, however, that the statute does not specifically require the school to obtain an occupancy permit from Milwaukee and claims that there is a conflict between the statute and the administrative rule. Although More concedes that "[r]equiring a school to obtain an occupancy permit is clearly within DPI's authority since WIS. STAT. § 119.23(2)(a) 5 requires that a private school meet all health and safety laws or codes that apply to public schools[,]" it insists that the "DPI cannot by administrative rule exclude from Choice those schools that the legislature has determined to be eligible for Choice."

¶ 21.  It is clear from our analysis above, however, that the legislature did not intend for schools like More to be eligible for Choice, in that the statute itself requires schools to obtain an occupancy permit from the City of Milwaukee. The administrative rule has not excluded any eligible schools from participating in Choice. It has merely clarified the requirement set forth in WIS. STAT. § 119.23(2)(a)5. An administrative rule that requires a school to file a certificate of occupancy issued by the City of Milwaukee in order to participate in the "Milwaukee parental choice program" hardly

seems contradictory. It is a reasonable clarification of the requirements broadly set forth in the statute. There is no conflict here.

¶ 22. The City of Milwaukee refused to issue the requisite certificate of occupancy because it determined that More was not located in the City of Milwaukee, and accordingly, the DPI rejected More's request to participate in the program, noting in part: "we have been advised by the City of Milwaukee, Milwaukee Development Center, that the City of Milwaukee does not have the authority to issue a certificate of occupancy for Thomas More because its school buildings are under the jurisdiction of the City of St. Francis." Without the requisite certificate on file, More is ineligible. More did not challenge the City of Milwaukee's refusal to issue the certificate, and the DPI has not, by administrative rule, "excluded from Choice those schools that the legislature has determined to be eligible for Choice." Accordingly, we affirm.

*By the Court.*—Order affirmed.

¶ 23. FINE, J. (*dissenting*). The Majority permits what I perceive as a clearly political decision by Elizabeth Burmaster to trump the legislature's command that poor children living in the City of Milwaukee be able to attend private schools "located in the city" of Milwaukee. Accordingly, I respectfully dissent.

¶ 24. The legislative command is clear:

**(2)** (a) Subject to par. (b), any pupil in grades kindergarten to 12 who resides within the city may attend, at no charge, any private school located in the city if all of the following apply:

1. The pupil is a member of a family that has a total family income that does not exceed an amount equal to 1.75 times the poverty level determined in accordance

238

with criteria established by the director of the federal office of management and budget.

2. In the previous school year the pupil was enrolled in the school district operating under this chapter, was attending a private school under this section, was enrolled in grades kindergarten to 3 in a private school located in the city other than under this section or was not enrolled in school.

3. The private school notified the state superintendent of its intent to participate in the program under this section by February 1 of the previous school year. The notice shall specify the number of pupils participating in the program under this section for which the school has space.

4. The private school complies with 42 USC 2000d.

5. The private school meets all health and safety laws or codes that apply to public schools.

Wɪs. Sᴛᴀᴛ. § 119.23.[1] As the Majority recognizes, the key phrase, from which all aspects of its decision flow,

---

[1] Wɪsᴄᴏɴsɪɴ Sᴛᴀᴛ. § 119.23(2)(b) is not applicable here. It provides:

> No more than 15% of the school district's membership may attend private schools under this section. If in any school year there are more spaces available in the participating private schools than the maximum number of pupils allowed to participate, the department shall prorate the number of spaces available at each participating private school.

42 U.S.C. § 2000d also does not apply here, except as reifying the intent behind § 119.23(2)(a) to give every Milwaukee child equal access to quality education. It provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

is: "any private school located in the city." According to the Majority, Thomas More High School is not "located in the city" of Milwaukee because only some twenty percent of its grounds are in Milwaukee, and all of the buildings are in the City of St. Francis. I respectfully disagree.

¶ 25. More than bricks and mortar do a school make. Athletics are essential to the whole person and enhance the school experience of all students, even those who sit and cheer, as did I when I was a student. But beyond that, where would the Majority draw the line? It seems to say that in order to participate under WIS. STAT. § 119.23 (The **Milwaukee parental choice program**") (bolding in original), a school's *buildings* must be in the City of Milwaukee. All of them? Ninety-eight percent of them? Fifty percent? Two percent? In my view, a school is where it is, and if it straddles two or more municipalities, it is "located" in each of them. Indeed, both the Wisconsin Interscholastic Athletic Association and the Woodland Conference consider Thomas More High School a City of Milwaukee school.

¶ 26. The Majority also opines that Thomas More High School cannot comply with WIS. STAT. § 119.23(7)(d)1 (schools participating in the voucher program must submit a "copy of the school's current certificate of occupancy issued by the city") because "it would be impossible to do so." Majority, ¶ 17. The Majority does not explain, and I do not understand, either: (a) why Milwaukee cannot issue a "certificate of occupancy," or join in a certificate of occupancy with overlapping jurisdiction, for a facility that straddles Milwaukee and another community; or (b) why, under the *statute,* a certificate of occupancy issued by the City of St. Francis should not suffice. As to the latter point, the statute, unlike Burmaster's regulation, uses the

word "city" in establishing the safety-based requirement that schools participating in the choice program have a certificate of occupancy. We can ascribe more than one meaning to the same word when that is necessary to reify legislative intent. *See Wisconsin Citizens Concerned for Cranes & Doves v. Wisconsin Dep't of Natural Res.*, 2004 WI 40, ¶¶ 19–24, 270 Wis. 2d 318, 338–342, 677 N.W.2d 612, 622–624 (mourning doves are "game," defined as "wild . . . birds," even though they are not "game birds" and are within the category of "nongame species"); *Turner v. City of Milwaukee*, 193 Wis. 2d 412, 420, 535 N.W.2d 15, 17 (Ct. App. 1995) (when statutes on the same subject conflict or are inconsistent with one another, courts must attempt to harmonize them in order to effectuate the legislature's intent). Assume that *some* of Thomas More High School's buildings *were* in Milwaukee, who would, under the Majority's rationale, issue the certificate of occupancy for those buildings in St. Francis?[2]

¶ 27. The legislature has clearly commanded that private schools "located in the city" of Milwaukee be allowed to participate in the Milwaukee parental choice program. Its concurrent desire that the schools be safe, and thus have a certificate of occupancy, should not be used as a device to deprive those qualifying Milwaukee

---

[2] WISCONSIN STAT. § 119.23(7)(d)1 is not the only provision where a certificate of occupancy is needed for property that may be in two or more adjoining municipalities. WISCONSIN STAT. § 823.114(1)(d) authorizes the circuit court to order closure of buildings deemed to be nuisances "until all building code violations are corrected and a new certificate of occupancy is issued if required by the city, town or village within which the property is located." The Majority's definition of "located" makes this provision a nullity for properties that straddle two or more units of local government.

children whose parents want to give them an education at Thomas More High School the opportunity to do so (absent, of course, any evidence, and there is none in this record, that Thomas More High School is unsafe). Indeed, as the Majority recognizes, the legislature attempted to clarify that Thomas More High School could participate in the Milwaukee parental choice program, but the legislation was *vetoed* by Governor Jim Doyle. *See* Majority, ¶ 8. I wonder how Burmaster can argue that we should discern *legislative intent* from a governor's veto of legislation passed by both houses of the legislature. Further, the Majority's reprinting of part of Burmaster's letter rejecting Thomas More High School's application to participate in the choice program raises more questions than it answers. First, 2001 Wis. Act 16 was the biennium budget enacted on August 30, 2001. In slip form together with gubernatorial vetoes, it is 789 pages. *See* http://www.legis.state.wi.us/2001/data/acts/01Act16.pdf. Neither Burmaster nor the Majority explains why an unspecified provision relating to Thomas More High School did not make it into that mélange. Many reasons may swim below the surface, including legislators' desire to get an early start on Labor Day without having the budget bill's adoption process riven by debate. Second, we cannot assess what weight to give to what was done (and, again, we do not know *what* was done or *why*) without knowing the proposal or proposals to which Burmaster may have been referring and the specific language. All we have is Burmaster's letter purporting to relate what the legislature or some legislators may or may not have done. In my view, that is a watery meringue that supports no weight.

¶ 28. I'm reminded of how Gertrude Stein expressed the futility of trying to return to her Oakland California roots because so much had changed in the

years since she had left her childhood home: "there is no there there." GERTRUDE STEIN, EVERYBODY'S AUTOBIOGRAPHY 298 (Exact Change 1993) (1937). The Majority says, in essence, that there is no "there" for Thomas More High School; under the Majority's rationale, Thomas More High School is nowhere. I respectfully dissent.